**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| PLANNED PARENTHOOD OF TENNESSEE AND NORTH MISSISSIPPI, on behalf of itself, its physicians and staff, and its patients; MEMPHIS CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself, its physicians and staff, and its patients; KNOXVILLE CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself, its physicians and staff, and its patients; FEMHEALTH USA, INC., d/b/a CARAFEM, on behalf of itself, its physicians and staff, and its patients; and AUDREY LANCE, M.D., M.S., on behalf of herself and her patients, | CIVIL ACTION<br><br>CASE NO._____<br><br>JUDGE_____ |

Plaintiffs,

v.

HERBERT H. SLATERY III, Attorney General of Tennessee, in his official capacity; LISA PIERCEY, M.D., Commissioner of the Tennessee Department of Health, in her official capacity; RENE SAUNDERS, M.D., Chair of the Board for Licensing Health Care Facilities, in her official capacity; W. REEVES JOHNSON, JR., M.D., President of the Tennessee Board of Medical Examiners, in his official capacity; HONORABLE AMY P. WEIRICH, District Attorney General of Shelby County, Tennessee, in her official capacity; GLENN FUNK, District Attorney General of Davidson County, Tennessee, in his official capacity; CHARME P. ALLEN, District Attorney General of Knox County, Tennessee, in her official capacity; and TOM P. THOMPSON, JR., District Attorney General for Wilson County, Tennessee, in his official capacity,

Defendants.

## COMPLAINT

Plaintiffs Planned Parenthood of Tennessee and North Mississippi, Memphis Center for

Reproductive Health, Knoxville Center for Reproductive Health, FemHealth USA, d/b/a

carafem, and Audrey Lance, M.D., M.S. (collectively, "Plaintiffs"), on behalf of themselves,

1

their staff and physicians, and their patients, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, and in support thereof allege the following:

## I.     PRELIMINARY STATEMENT

1.      Plaintiffs bring this civil rights action, on behalf of themselves, their staff and physicians, and their patients seeking abortions, under the U.S. Constitution and pursuant to 42 U.S.C. § 1983, to challenge the constitutionality of Section 39-15-218 of H.B. 2263/S.B. 2196 (the "Act") (attached as Exhibit A and codified at Tenn. Code Ann. § 39-15-218). Unless enjoined by this Court, the Act will take effect on October 1, 2020, irreparably harming Plaintiffs, their staff and physicians, and their patients and violating their constitutional rights.

2.      The Act forces physicians to advise their patients that medication abortion may be reversible, a claim that is wholly unsupported by reliable scientific evidence and that has been rejected by the field's trusted medical authorities, including the American Medical Association ("AMA") and the American College of Obstetricians and Gynecologists ("ACOG"). Plaintiffs object to this compelled speech, which requires them (1) to communicate to their patients false and misleading information with which they disagree; (2) to refer their patients to a governmental website encouraging them to partake in experimental and unproven treatments that run counter to their patients' best interests; and (3) to violate their ethical obligations as medical providers.

3.      By forcing Plaintiffs to communicate a government-ordered message with which they and the overwhelming consensus of the medical profession disagree, and to present abortion patients with untruthful, misleading, and irrelevant information, the Act violates the First Amendment right of Plaintiffs and their staff and physicians against compelled speech, as well as their patients' privacy rights under the Fourteenth Amendment. The Act likewise violates the

2

Fourteenth Amendment's guarantee of equal protection, singling out abortion providers and patients for adverse treatment not imposed on any other medical providers or patients in the State. These constitutional violations will immediately result in irreparable harm if the Act is permitted to take effect, damaging the trust at the heart of the physician-patient relationship, misleading patients at the moment when they are making important medical decisions, and exposing patients to a scientifically unsupported and potentially harmful medical practice.

4.  To protect Plaintiffs, their staff and physicians, and their patients from these constitutional violations, and to avoid irreparable harm, Plaintiffs seek declaratory and injunctive relief to prevent enforcement of the Act.

## II.  JURISDICTION AND VENUE

5.  Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

6.  Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

7.  Venue is appropriate under 28 U.S.C § 1391(b) because one or more of the Defendants resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## III.  PARTIES

### A.  Plaintiffs

8.  Planned Parenthood of Tennessee and North Mississippi ("PPTNM") is a not-for-profit corporation operating health centers in Tennessee. For the last seventy-nine years, the

3

mission of PPTNM and its predecessors[1] has been to provide accessible, affordable, and high-quality evidence-based reproductive health care. PPTNM's philosophy of care is to provide non-judgmental sexual and reproductive health care to all, ensuring patients receive unbiased, accurate, and complete information. PPTNM's four health centers (two in Memphis, one in Nashville, and one in Knoxville) provide a wide range of reproductive and sexual health services to patients, including wellness visits (or "well-woman exams"), cancer screenings, birth control counseling, human papillomavirus vaccines, annual gynecological exams, pregnancy care, contraception, adoption referral, miscarriage management, and abortion care. Three of PPTNM's health centers provide medication abortion through eleven weeks (seventy-seven days) from the first day of a patient's last menstrual period ("LMP")[2]; two health centers (one in Memphis and one in Nashville, both of which are licensed as ambulatory surgical treatment centers, or "ASTCs") offer procedural abortion services. PPTNM sues on its own behalf and on behalf of its physicians, staff, and patients.

9. Plaintiff Memphis Center for Reproductive Health is a non-profit organization that operates CHOICES, a women's health clinic in Memphis, Tennessee ("Choices Memphis"). Its mission is to provide patient-centered medical care and champion sexual and reproductive rights. This includes respecting patient autonomy, ensuring patients receive accurate, relevant, and unbiased information when making healthcare decisions, and providing care in a non-judgmental, supportive way. In operation since 1974, Choices Memphis strives to empower individuals to make informed decisions about their reproductive health; the clinic offers a full

---

[1] PPTNM was formed in June 2018 by the merger of two prior Planned Parenthood entities: Planned Parenthood Greater Memphis Region ("PPGMR") and Planned Parenthood of Middle and East Tennessee ("PPMET").

[2] The gestational age of a pregnancy is generally measured based on a patient's last menstrual period.

4

range of sexual and reproductive health care, including gynecology care, fertility services, health care services for lesbian, gay, and transgender individuals, testing and treatment for sexually transmitted infections, HIV testing and referrals, midwifery care, medication abortions up to eleven weeks LMP, and procedural abortions. Choices Memphis sues on its own behalf and on behalf of its physicians, staff, and patients.

10.     Plaintiff Knoxville Center for Reproductive Health ("KCRH") is a non-profit reproductive health center that has been providing high-quality reproductive health care services to patients since 1975. KCRH is an ASTC and provides a range of reproductive health services, including cancer screenings, testing and treatment for sexually transmitted infections, medication abortions before eleven weeks LMP and procedural abortions. KCRH sues on its own behalf and on behalf of its physicians, staff, and patients.

11.     Plaintiff carafem is a non-profit organization dedicated to providing women's reproductive health services. Carafem operates a health center in Mt. Juliet, Tennessee, that provides information and low-cost options for most methods of birth control and testing for sexually transmitted infections, as well as medication abortion care up to eleven weeks LMP and procedural abortions. Carafem sues on its own behalf and on behalf of its physicians, staff, and patients.

12.     Plaintiff. Audrey Lance, M.D., M.S. is an obstetrician/gynecologist licensed to practice in the State of Tennessee. She has provided medication abortion to patients at health centers run by Plaintiff PPTNM since January 2019. Dr. Lance currently provides medication abortions at PPTNM through eleven weeks LMP, as well other healthcare Dr. Lance sues on behalf of herself and her patients.

13. PPTNM, Choices Memphis, KCRH, and carafem (collectively, the "Clinics") face civil penalties of $10,000 per day for any violation of the Act, as well as possible disciplinary penalties. The Clinics' physicians, including Dr. Lance, face potential felony criminal prosecution, prison time, civil liability, and potential medical licensure penalties for violations of the Act.

**B. Defendants**

14. Defendant Herbert H. Slatery III is the Attorney General of Tennessee. He is responsible for defending Tennessee laws against constitutional challenge. *See* Tenn. Code Ann. § 8-6-109(b)(9). Further, he has exclusive authority to prosecute criminal violations in Tennessee's appellate courts. *See* Tenn. Code Ann. § 8-6-109(b)(2); *State v. Simmons*, 610 S.W.2d 141, 142 (Tenn. Crim. App. 1980). He is sued in his official capacity.

15. Defendant Lisa Piercey, M.D., is the Commissioner of the Tennessee Department of Health (the "Department"). The Act directs the Department to "assess any private office, ambulatory surgical treatment center, or other facility or clinic that negligently fails to post a sign required by subsection (b) a civil penalty of ten thousand dollars ($10,000)," with "[e]ach day on which an abortion, other than in the case of a medical emergency, is performed . . . during which the required sign is not posted [constituting] a separate violation." Tenn. Code Ann. § 39-15-218(k). It also directs the Department to maintain a website containing information on and resources available to assist with medication abortion "reversal" to which Plaintiffs are required to refer their patients. *Id.* §§ 39-15-218(e)(2), (h), (i). Dr. Piercey is sued in her official capacity.

16. Defendant Rene Saunders, M.D., is the Chair of the Board for Licensing Health Care Facilities. The Board for Licensing Health Care Facilities has the authority to discipline ASTCs, for, among other things, permitting, aiding or abetting the commission of any illegal act

6

in the ASTC or conduct or practice found by the board to be "detrimental to the health, safety, or welfare of the patients" of the ASTC. Tenn. Code Ann. § 68-11-207(a)(3); Tenn. Comp. R. & Regs. 1200-08-10-.03(1)(d). Dr. Saunders is sued in her official capacity.

17.     Defendant W. Reeves Johnson, Jr., M.D., is the President of the Tennessee Board of Medical Examiners. The Board of Medical Examiners is empowered to take disciplinary action against a physician who violates various laws and regulations including those "governing abortion." Tenn. Code Ann. § 63-6-214(b)(6). Dr. Johnson is sued in his official capacity.

18.     Defendant Amy Weirich is the District Attorney General for Shelby County. She is responsible for prosecuting all violations of the state criminal statutes occurring in Shelby County, which includes Memphis. Violations of the Act are Class E felonies, *see* Tenn. Code Ann. § 39-15-218(j), and are punishable by imprisonment of one to six years and a fine not to exceed $3,000. *See* Tenn. Code Ann. § 40-35-111(b)(5). Ms. Weirich is sued in her official capacity.

19.     Defendant Glenn R. Funk is the District Attorney General for Nashville. He is responsible for prosecuting all violations of the state criminal statutes occurring in Metropolitan Nashville and Davidson County. Violations of the Act are Class E felonies, *see* Tenn. Code Ann. § 39-15-218(j), and are punishable by imprisonment of one to six years and a fine not to exceed $3,000. *See* Tenn. Code Ann. § 40-35-111(b)(5). Mr. Funk is sued in his official capacity.

20.     Defendant Charme P. Allen is the District Attorney General for Knox County. She is responsible for prosecuting all violations of the state criminal statutes occurring in Knox County, which includes Knoxville. Violations of the Act are Class E felonies, *see* Tenn. Code Ann. § 39-15-218(j), and are punishable by imprisonment of one to six years and a fine not to

exceed $3,000. *See* Tenn. Code Ann. § 40-35-111(b)(5). Ms. Allen is sued in her official capacity.

21.     Defendant Tom P. Thompson, Jr. is the District Attorney General for Wilson County. He is responsible for prosecuting all violations of the state criminal statutes occurring in Wilson County, which includes Mt. Juliet. Violations of the Act are Class E felonies, *see* Tenn. Code Ann. § 39-15-218(j), and are punishable by imprisonment of one to six years and a fine not to exceed $3,000. *See* Tenn. Code Ann. § 40-35-111(b)(5). Mr. Thompson is sued in his official capacity.

## IV.     FACTUAL ALLEGATIONS

### A.     Abortion in Tennessee

22.     Abortion is one of the safest and most common medical procedures performed in the United States. Nationwide, nearly one in four women[3] will obtain an abortion by age forty-five.[4] In 2018, the last year for which statistics are currently available, 10,880 abortions were performed in Tennessee.[5]

23.     Plaintiffs' patients seek abortions for a variety of deeply personal reasons. Some seek abortions because they conclude that it is not the right time in their lives to have a child or

---

[3] Plaintiffs use "woman," "women," "she," or "her" in this complaint to refer to people who are or may become pregnant, but they note that people of all gender identities, including gender non-conforming people and transgender men, may also become pregnant and seek abortion services and would thus also suffer irreparable harm as a result of the Act.

[4] *See* Guttmacher Inst., News Release, *Abortion Is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates* (Oct. 19, 2017), https://www.guttmacher.org/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.

[5] Tenn. Dep't of Health, Div. of Vital Records & Statistics, *Selected Induced Termination of Pregnancy (ITOP) Data, According to Age and Race of Woman, Tennessee and Department of Health Regions, Resident Data, 2018*, at 1 (2018), https://www.tn.gov/content/dam/tn/health/documents/vital-statistics/itop/ITOP2018.pdf (hereinafter "TN ITOP Report").

8

to add to their families. Some decide to end a pregnancy because they want to pursue their education; some because they feel they lack the necessary economic resources, level of partner support or stability. Some seek abortions because they are experiencing intimate partner violence and may face additional threats to their safety if their partner becomes aware of their pregnancy or desire for an abortion; many such patients fear that being forced to carry the pregnancy to term would further tether them to their abusers. Some seek abortions because they have become pregnant as a result of rape. Regardless of their reasons for seeking abortion care, the overwhelming majority of Plaintiffs' patients are firm in their decisions to terminate their pregnancies by the time they arrive at the Clinics.

24.     There are generally two methods of providing abortion care: procedural abortion and medication abortion.

25.     Procedural abortion involves the use of instruments to gently dilate (open) the cervix and evacuate the contents of the uterus. Although it is sometimes referred to as "surgical" abortion, procedural abortion is not what is commonly understood to be surgery, as it involves no incision, no need for general anesthesia, and no need for a sterile field.

26.     The most common form of medication abortion is a regimen of two prescription drugs, mifepristone and misoprostol. Mifepristone, also known as "RU-486" or by its commercial name Mifeprex, was first approved by the U.S. Food and Drug Administration ("FDA") in 2000 as an effective alternative to procedural abortion in early pregnancy when used in conjunction with misoprostol. As with other prescription drugs, the combined use of mifepristone and misoprostol—collectively referred to as "medication abortion"—is regulated by the FDA.

9

27.     Mifepristone works by temporarily blocking the hormone progesterone, which is necessary to maintain pregnancy, and by increasing the efficacy of the second medication in the regimen, misoprostol. Misoprostol, which is typically taken between twenty-four to forty-eight after mifepristone, causes the uterus to contract and expel its contents. The pregnancy is passed outside the health clinic in a process similar to miscarriage. The use of mifepristone in combination with misoprostol is evidence-based and widely used to terminate pregnancies through eleven weeks (or seventy-seven days) LMP.

28.     Since 2000, more than four million patients in the United States and millions more worldwide have had medication abortions.[6]

29.     While the precise figure varies across the Clinics, between 40–60% of abortions performed at the Clinics are medication abortions.

30.     Some patients prefer medication abortion because it feels less invasive and more natural, and provides patients with more privacy and control over the process. Others seek medication abortion because they have a history of sexual trauma, and having instruments inserted vaginally will cause them emotional distress. And for some patients with certain medical conditions, medication abortion is medically preferable. Plaintiffs have observed an increasing preference for medication abortion among their patient population during the COVID-19 pandemic because it requires less in-person contact than procedural abortion.

---

[6] *Mifeprex Effectiveness and Advantages*, Danco Laboratories, https://www.earlyoptionpill.com/is-mifeprex-right-for-me/effectiveness-advantages/ (last visited Aug. 27, 2020).

31.     The FDA has confirmed that the two-drug medication abortion regimen is extremely safe and effective in terminating a pregnancy.[7]

32.     Both procedural abortion and medication abortion will fail to terminate a pregnancy in a small minority of cases. According to the FDA, the success rate for medication abortion in the United States, when administered using mifepristone and misoprostol in accordance with the 2016 FDA label protocol, is 97.4%.[8]

33.     Mifepristone and misoprostol are each independently capable of terminating a pregnancy in a smaller percentage of cases. For maximum efficacy and safety, however, they are intended to be used as a combined regimen.

34.     The standard of medical care before starting any abortion procedure is for healthcare providers to counsel their patients to be certain in their decision to terminate the pregnancy. For medication abortion patients, this means ensuring patients are firm in their decision to terminate the pregnancy before starting the two-drug regimen, because mifepristone alone will result in an abortion in a majority of pregnancies.

35.     Plaintiffs are therefore careful during the patient counseling process to confirm a patient's decisional certainty before starting any aspect of the mifepristone/misoprostol regimen. As Plaintiffs emphasize to any patient considering a medication abortion, if she is not certain in her decision, she should take the time she needs to reflect and reach a firm decision; she must not begin the medication abortion process until she is confident that she wishes to terminate the pregnancy.

---

[7] *MIFEPREX (Mifepristone) Tablets Label*, FDA,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf (2016).

[8] *Id.*

36. The vast majority of Plaintiffs' patients are certain of their decision to obtain an abortion by the time they arrive at the health center for their pre-abortion counseling. Most patients have considered their options and made up their minds several days, if not weeks, before they arrive for the abortion. But in the extremely rare event that a patient is uncertain of her decision at the time of her scheduled abortion appointment, Plaintiffs will not provide the abortion. Clinic staff will instead encourage the patient to take more time to consider her options and make the decision that is right for her, and if she wishes, to reschedule her appointment.

**B. Tennessee's Preexisting Laws Governing Informed Consent Requirements and Pre-Abortion Counseling and Plaintiffs' Practices**

37. Tennessee has a preexisting series of requirements that abortion providers must satisfy as a precondition to providing either procedural or medication abortion.

### i. Informed Consent Requirements

38. Under a generally applicable statutory requirement for all medical treatments and procedures, Tennessee directs all physicians to obtain a patient's informed consent prior to providing any treatment or performing any procedure, or risk civil liability. *See* Tenn. Code Ann. § 29-26-118. To comply with this requirement, a physician must "supply appropriate information to the patient . . . in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the [physician] practices in the community in which the [physician] practices and in similar communities." *Id.* Pursuant to this requirement and Plaintiffs' ethical obligation to ensure that their patients make informed medical decisions, Plaintiffs provide patients with appropriate, medically accurate information concerning the details, risks, and benefits of the abortion and its alternatives so that they can make informed decisions about the abortion. *See* ¶¶ 41–46, *infra*.

12

### ii. Pre-Abortion Counseling Requirements

39. Separate and apart from the requirement to obtain informed consent prior to any medical treatment or procedure, Tennessee also imposes multiple abortion-specific requirements. First, at least forty-eight hours prior to the abortion, a physician must provide patients with five categories of specified information, including, *inter alia*, "the normal and reasonably foreseeable medical benefits, risks, or both of undergoing an abortion or continuing the pregnancy to term." Tenn. Code Ann. § 39-15-202(b)(5). The requirement that these disclosures be given in person forty-eight hours prior to the abortion (the "Delay Requirement") forces patients to travel for and attend at least two separate appointments at the health center—the first to receive the state-mandated information, and the second to undergo the procedure or obtain the medication. A physician who violates the Delay Requirement is subject to criminal and licensure penalties. *Id.* § 39-15-202(h). The Delay Requirement is burdensome and medically unnecessary, and is the subject of pending litigation in this District. *See Adams & Boyle v. Slattery*, No. 3:15-cv-00705 (M.D. Tenn.).

40. Second, Tennessee law requires that, prior to the abortion, a physician or qualified technician must perform an ultrasound and, *inter alia*, display the images to the patient, describe those images in State-specified detail, and auscultate (i.e., produce the sounds of) fetal cardiac activity if it is audible. Tenn. Code Ann. § 39-15-215(b).

### iii. Plaintiffs' Informed Consent and Pre-Abortion Counseling Practices

41. In both performing pre-abortion counseling and obtaining informed consent, Plaintiffs are guided not only by the legal obligations contained in these statutes, but also by their ethical obligations to provide honest and accurate information to their patients and facilitate their patients' processes of making informed decisions about their medical care.

13

42.     As required by Tennessee law, pre-abortion counseling currently must begin at least forty-eight hours before the patient's abortion, when a patient is required to travel to the clinic for an in-person appointment at which Plaintiffs discuss with the patient her options and alternatives (including parenting, adoption, and abortion), and the abortion methods that are available to her depending on the gestational age of the pregnancy and her medical history, as well as their risks and benefits.

43.     Discussions about the patient's medical history, health status, specific situations, and relevant medical options continue throughout the patient's interactions with the clinic, up until the time when the patient's abortion begins.

44.     Prior to any abortion, Plaintiffs also perform the specific task of obtaining the patient's informed consent to the abortion. The informed consent process includes discussing with the patient the risks, benefits, and relevant medical details associated with the abortion and alternatives to abortion so that a patient can make a well-informed decision, based on her specific situation, wishes and values, about whether having an abortion, and the abortion method she has selected, are right for her.

45.     To make informed consent possible, patients must be given medically accurate, necessary information about the treatment or procedure so that they can make the right decisions for themselves. Patients rely upon their medical providers to give them accurate, relevant information, and when providers present information to patients about the treatment options that are available and their expected outcomes, patients expect the information to be grounded in evidence and the medical provider's best medical judgment.

46.     It is antithetical to the purpose of informed consent, and a violation of medical ethics, for a medical provider to give misleading or inaccurate information to a patient during the

14

informed consent process. Doing so would undermine the patient's ability to make an informed decision about whether to undergo a particular medical treatment, thereby misinforming the patient at the very moment she requires a clear, accurate presentation of pertinent information so that she can decide on a course of treatment.

### C. The Challenged Medication Abortion Reversal Mandate

47.     The Act compels Plaintiffs to convey scientifically unsupported and misleading information to their patients, contravening long-established principles of informed consent and violating the constitutional rights of Plaintiffs, their physicians and staff, and their patients.

48.     First, it requires that any "private office, ambulatory surgical treatment center, as defined in § 68-11-201, or other facility, as defined in § 68-11-201, or clinic" that performed "more than fifty (50) elective abortions" during the previous calendar year "conspicuously post" in designated locations signs "clearly visible to patients" with the following state-ordered text:

> Recent developing research has indicated that mifepristone alone is not always effective in ending a pregnancy. It may be possible to avoid, cease, or even reverse the intended effects of a chemical abortion utilizing mifepristone if the second pill has not been taken. Please consult with a healthcare professional immediately.

Tenn. Code Ann. § 39-15-218(b). These signs "must be printed with lettering that is legible and at least three quarters of an inch (0.75") boldfaced type." *Id*. § 39-15-218(c). Private offices or ASTCs must post these signs "in each patient waiting room and patient consultation room used by patients on whom abortions are performed." *Id*. § 39-15-218(d). Facilities other than private offices and ASTCs must "post the required sign in each patient admission area used by patients on whom abortions are performed." *Id.*

15

49.     Second, except in narrowly defined medical emergencies,[9] the Act requires that the physician who is to perform the abortion inform the patient at least forty-eight hours prior to the abortion that (1) "[i]t may be possible to reverse the intended effects of a chemical abortion utilizing mifepristone if the woman changes her mind, but that time is of the essence," and (2) "[i]nformation on and assistance with reversing the effects of a chemical abortion utilizing mifepristone is available on the department of health website." *Id.* § 39-15-218(e).

50.     Third, after dispensing mifepristone, the physician or an agent of the physician must "provide written medical discharge instructions" that include the same state-mandated statement about reversing medication abortion as is required on the signs. *Id.* § 39-15-218(f).

51.     Fourth, within ninety days of the Act's effective date, the Department is required to "publish, in English and in each language that is the primary language of two percent (2%) or more of this state's population, and make available on the department's website," materials that are "designed to inform the woman of the possibility of reversing the effects of a chemical abortion utilizing mifepristone if the woman changes her mind and information on and assistance with the resources that may be available to help reverse the effects of a chemical abortion." *Id.* § 39-15-218(h).

---

[9] The Act defines "medical emergency" as "a condition that, in reasonable medical judgment, so complicates the medical condition of the pregnant woman as to necessitate the immediate abortion of her pregnancy to avert the death of the pregnant woman or for which a delay will create serious risk of substantial and irreversible physical impairment of a major bodily function, not including psychological or emotional conditions. No condition is a medical emergency if based on a claim or diagnosis that the woman will engage in conduct that the woman intends to result in the death or in substantial and irreversible physical impairment of a major bodily function of the woman." Tenn. Code Ann. § 39-15-218(a)(3).

16

52.     Any person who knowingly or recklessly performs or attempts to induce an abortion in violation of the Act is guilty of a Class E felony, *id.* § 39-15-218(j), subject to imprisonment of one to six years and a $3,000 fine, *id.* § 40-35-111(b)(5).

53.     Any facility that fails to post the required signage will be fined $10,000 per day by the Department. *Id.* § 39-15-218(k).

54.     Physicians who provide, or attempt to provide, a medication abortion without the state-mandated disclosures are also subject to actual and punitive damages in a lawsuit brought by the patient, the "father" of the embryo or fetus, or the parents of a minor patient or a deceased patient. *Id.* § 39-15-218(l).

**D.      Facts About So-Called "Medication Abortion Reversal"**

55.     There is no credible evidence that a medication abortion administered by the combined mifepristone-misoprostol regimen, once begun, can be reversed.

56.     Indeed, once an abortion has occurred, whether by medication or by any other means, a patient is no longer pregnant, which cannot be reversed.

57.     Upon information and belief, the Act's concept of ceasing, avoiding, or reversing a medication abortion is based on an experimental practice proposed by Drs. George Delgado and Mary Davenport, physicians based in San Diego, California who have alleged that they can "reverse" the effects of mifepristone prior to the administration of misoprostol. Upon information and belief, certain other physicians around the United States have experimented with this practice, which involves either injecting or prescribing large doses of progesterone to patients who have taken mifepristone but have not yet taken misoprostol. While there is no consensus on the protocol for these doses of progesterone, some physicians have experimented

17

with weekly injections, in some cases until the end of pregnancy, as well as oral and vaginal routes of progesterone administration.

58.     Progesterone injections are typically administered by a physician or clinician, while oral and vaginal progesterone, available by prescription only, can be administered by the patient. Although progesterone is generally considered a low-risk medication, it does carry risks. Progesterone has been associated with maternal complications such as depression, cholestatic jaundice, and hypertension. And while some data support the general safety of progesterone in pregnancy, other studies have raised concerns about possible associations with second-trimester miscarriage, stillbirth, and certain birth defects.[10]

59.     That a small number of physicians have started experimenting with using progesterone to attempt to counteract mifepristone does not constitute credible, medically accepted evidence that the experimental practice is effective or safe.

60.     Significantly, this unproven treatment—and government-ordered speech mandates promoting it by health care providers—are opposed by leading medical organizations. ACOG, the nation's premier professional organization of obstetricians and gynecologists, has determined that "no evidence" supports the efficacy of so-called medication abortion "reversal," and that interrupting the two-drug medication abortion regimen may be associated with medical risk.[11] And the AMA, the largest physician association in the United States, not only opposes mandated disclosures about this practice, but also has sued North Dakota over a medication

---

[10] *See, e.g.*, Paul J. Meiss et al., *Prevention of Recurrent Preterm Delivery by 17-Alpha-Hydroxyprogesterone Caproate*, 348 N. Eng. J. Med. 2379, 2382 (2003); Suzan L. Carmichael et al., *Maternal Progestin Intake and Risk of Hypospadias*, 159(10) Archives of Pediatric & Adolescent Med. 957 (2005).

[11] ACOG, *Practice Bulletin No. 225: Medication Abortion up to 70 Days of Gestation*, 136 Obstetrics & Gynecology 1, 3 (2020).

abortion "reversal" speech mandate similar to the Act on the basis that the disclosure is misleading and untruthful.[12]

61.     Medication abortion is more effective when both mifepristone and misoprostol are used together because mifepristone alone will not always cause an abortion. No credible, scientific evidence supports the proposition that administering progesterone increases the probability of ongoing pregnancy after a patient takes mifepristone but does not complete the medication abortion regimen with misoprostol.

62.     Because there is no credible, scientific evidence that a medication abortion can be reversed, Plaintiffs do not and cannot tell their patients that it may be possible to reverse a medication abortion without misleading them. Similarly, Plaintiffs do not tell their patients that information and assistance is available to reverse a medication abortion, and they could not do so without misleading their patients.

## V.     THE IMPACT OF THE ACT ON PLAINTIFFS AND THEIR PATIENTS

63.     The Act compels Plaintiffs and their physicians, unwillingly and against their best medical judgment, to convey to their patients' content- and viewpoint-based governmental messages and to direct their patients to government-created materials and referral information, with which Plaintiffs and the overwhelming consensus of the medical profession vehemently disagree.

64.     Plaintiffs' mission is to provide evidence-based information and health care. Plaintiffs oppose being forced to provide the state-mandated communications because doing so would violate their principles, mission, and values.

---

[12] *See Am. Med. Ass'n v. Stenhjem,* 412 F.Supp.3d 1134, (D. N.D. 2019).

65. The Act also compels Plaintiffs and their physicians, against their medical judgment, to endorse a controversial practice, the safety and efficacy of which has not been demonstrated, and to steer their patients toward such an experimental practice.

66. Additionally, the Act requires Plaintiffs to post Tennessee's precise notice and provide it in print to patients following administration of mifepristone. The signs promoting "reversal" treatments must be posted in waiting areas and consultation rooms utilized not only by medication abortion patients, but also by patients seeking procedural abortions and other healthcare as well. The language on the signs is particularly irrelevant to patients seeking care other than medication abortion, and is likely to confuse patients seeking procedural abortion care, who may not know what a "chemical abortion utilizing mifepristone" means and whether it applies to them.

67. These requirements only apply to facilities in which abortion care is provided. The Act thus singles out facilities in which abortion care is provided; the staff and physicians providing such care; and the patients receiving it. No other healthcare providers in the State are compelled to post for their patients to view a government-scripted notice advertising an experimental, unproven medical practice. No other healthcare providers in the State are compelled to endorse or steer patients toward an experimental, unproven medical treatment of unknown safety, nor are any other patients mandated by the state to receive such information from their physicians.

68. By compelling Plaintiffs to communicate information to their patients that is not medically credible or scientifically established, the Act forces Plaintiffs to violate their ethical obligations to their patients and undermines the establishment of a relationship of trust and confidence between a patient and her chosen medical provider.

20

69.     Specifically, by forcing Plaintiffs and their physicians to inform patients that it "may be possible to reverse the intended effects of a chemical abortion utilizing mifepristone" and that "[i]nformation on and assistance with reversing the effects of a chemical abortion utilizing mifepristone is available," Tenn. Code Ann. § 39-15-218(e), the Act forces Plaintiffs and their physicians to provide their patients with information that is untruthful, misleading, and irrelevant to their medical decision-making. The government-mandated message required by the Act also directly contradicts a critical message Plaintiffs seek to convey to their patients during pre-abortion counseling: that they must be certain about terminating their pregnancy before they begin any aspect of the abortion process. Indeed, the Act forces Plaintiffs to create the risk that a patient will choose to begin an abortion before she is ready to do so, under the mistaken belief that the abortion can be reversed if the patient later chooses.

70.     The Act alters the content of Plaintiffs' speech to, at best, compel them to speak the government's controversial messages, and, at worst, to lie to patients about their options and undermine their patients' informed consent to medical care. No other healthcare providers in Tennessee are forced to do this.

71.     The Act is not an informed consent law, but rather its requirements distort and undermine the process of informed consent as dictated both by Tennessee law and by professional medical ethics.

72.     The Act forces physicians who provide abortion care—and only those physicians—to present patients with confusing, distracting, and untruthful information that is neither tailored to their specific medical situations nor related to the risks, benefits, and details of the abortion.

21

73. Tennessee does not mandate the provision of inaccurate, misleading information, against the medical provider's judgment in any other healthcare context. For example, while sterilization procedures *are* potentially reversible in certain cases, their intended effect is to be permanent. Physicians performing sterilization procedures in Tennessee are not compelled to tell patients that the procedure is reversible, precisely because the procedure is intended to be permanent.

74. The Act thus singles out physicians providing abortion and their patients, and limits physicians' ability to practice medicine in accordance with the overwhelming consensus of the medical profession and in the manner that they believe is in the best interests of their patients, and their patients' ability to receive such care.

75. There is no benefit, medical or otherwise, to requiring Plaintiffs to share false, misleading, and irrelevant information with their patients, and forcing Plaintiffs to do so exposes their patients to potential harm.

76. Distorting the informed consent process in this manner would adversely affect Plaintiffs' patients. A key purpose of informed consent is to provide a patient considering a course of medical treatment with clear, medically accurate information so that she can make a considered decision whether to proceed with the treatment. Patients rely on their medical providers to present them with truthful, relevant facts in a clear manner to facilitate thoughtful decision-making. Forcing Plaintiffs to make scientifically unsupported statements during the informed consent process will, at a minimum, cause patients to be confused at a moment when clear-headed thinking about medical treatment is necessary.

77. The Act further requires the medically inaccurate information about "reversing" an abortion to be communicated at least forty-eight hours prior to taking mifepristone, when

22

there is no abortion to "reverse." The only foreseeable effect of providing patients with this information in advance is that patients who believe the State's medically inaccurate disclosure may be misled into thinking that they need not have firmly decided to have an abortion prior to taking mifepristone, erroneously believing that the abortion can be "reversed" if they later change their mind. The Act likewise risks exposing patients to the potential harmful effects of an unproven and potentially unsafe medical procedure.

78.     The Act thus impedes Plaintiffs' ability to provide abortions to their patients under the highest standard of care; compels Plaintiffs to lie to and mislead their patients; interferes with the physician-patient relationship; impedes patients' medical decision-making; and risks exposing patients to an unproven and potentially harmful medical procedure.

## VI.     IRREPARABLE HARM AND INJUNCTIVE RELIEF

79.      The Act imposes an impermissible penalty and chill on Plaintiffs,' their physicians,' and their staff's speech, subjecting them to irreparable harm.

80.     Enforcement of the Act will irreparably harm Plaintiffs and their physicians and staff by infringing on their right to free speech under the First Amendment to the United States Constitution.

81.     Enforcement of the Act will likewise irreparably harm Plaintiffs' patients by subjecting them to untruthful, misleading, and irrelevant information about medication abortion "reversal"; interfering with their informed decision-making process and potentially misleading them into proceeding with a medication abortion before they are firm in their decision to have an abortion; and exposing them to unproven and potentially harmful medical treatments.

82.    The Act's mandate that physicians communicate an untruthful, misleading, and irrelevant government-drafted script to their patients undermines the trust patients place in their physicians, the integrity of the medical profession, and public health.

83.    Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I

### (First Amendment—Compelled Speech)

84.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 83.

85.    The Act violates Plaintiffs,' their physicians,' and their staff's rights under the First Amendment to the United States Constitution by compelling them, on pain of criminal penalty, to communicate a content-based, viewpoint-based, and/or controversial government-mandated message that they would not otherwise recite concerning an experimental medical treatment that has not been shown to be safe or effective, that violates accepted ethical standards and best practices in medical care, that undermines their ability to provide their patients with the highest standard of medical care, and that contradicts their viewpoints.

86.    The statements mandated by the Act undermine, rather than facilitate, informed consent and are untruthful, misleading, and irrelevant to the decision to have an abortion.

### COUNT II

### (Substantive Due Process—Untruthful, Misleading, and Irrelevant Disclosures)

87.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 83.

88.     The Act violates Plaintiffs' patients' rights under the Fourteenth Amendment to the United States Constitution by forcing them to receive information from their health care provider and the Department that is untruthful, misleading, and/or irrelevant to the decision to have an abortion, that provides no benefit, medical or otherwise, and that exposes them to potential harm.

## COUNT III

### (Equal Protection—Plaintiffs)

89.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 83.

90.     The Act violates Plaintiffs' right under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by singling out health care providers who offer abortions and requiring them, and no other similarly situated health care providers in the State, to communicate to their patients government-drafted scripts that impede the patient's informed consent process.

## COUNT IV

### (Equal Protection—Plaintiffs' Patients)

91.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 83.

92.     The Act violates Plaintiffs' patients' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by singling out medication abortion patients and requiring them, and no other patients receiving any other health care service in the State, to receive government-mandated disclosures from their physicians that impede the patient's informed consent process and expose them to potential harm.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

      A.      Immediately issue a temporary restraining order and/or preliminary injunction, later to be made permanent, restraining Defendants, their employees, agents, and successors in office from enforcing the Act;

      B.      Enter a judgment declaring that the Act is unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

      C.      Award Plaintiffs their reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

      D.      Grant such other or further relief as the Court deems just, proper, and equitable.

Dated: August 31, 2020

Respectfully submitted,

*/s/ Thomas H. Castelli*
Thomas H. Castelli (No. 24849)
Stella Yarbrough, (No. 33637)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

*Attorneys for Plaintiffs*

Christine Clarke*
Jennifer Sandman*

26

Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
Tel: (212) 261-4749
Tel: (212) 261-4405
Fax: (212) 247-6811
christine.clarke@ppfa.org
jennifer.sandman@ppfa.org

*Attorneys for Plaintiffs Planned Parenthood of
Tennessee and North Mississippi and Audrey
Lance, M.D., M.S.*

Andrew Beck*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
abeck@aclu.org

*Attorneys for Plaintiffs Knoxville Center for
Reproductive Health and FemHealth USA, Inc.*

Michelle Moriarty*
Center for Reproductive Rights
199 Water St., 22nd Floor
New York, NY 10038
Tel: (917) 637-3695
mmoriarty@reprorights.org

Marc Hearron*
Center for Reproductive Rights
1634 Eye St., N.W., Suite 600
Washington, DC 20006
Tel: (202) 524-5539
mhearron@reprorights.org

*Attorneys for Plaintiff Memphis Center for
Reproductive Health*

*Application for admission *pro hac vice*
forthcoming