**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

PLANNED PARENTHOOD OF TENNESSEE AND
NORTH MISSISSIPPI, on behalf of itself, its physicians
and staff, and its patients; MEMPHIS CENTER FOR
REPRODUCTIVE HEALTH, on behalf of itself, its
physicians and staff, and its patients; KNOXVILLE
CENTER FOR REPRODUCTIVE HEALTH, on behalf
of itself, its physicians and staff, and its patients;
FEMHEALTH USA, INC., d/b/a CARAFEM, on behalf
of itself, its physicians and staff, and its patients; and
AUDREY LANCE, M.D., M.S., on behalf of herself and
her patients,

      Plaintiffs,

      v.

HERBERT H. SLATERY III, Attorney General of
Tennessee, in his official capacity; LISA PIERCEY,
M.D., Commissioner of the Tennessee Department of
Health, in her official capacity; RENE SAUNDERS,
M.D., Chair of the Board for Licensing Health Care
Facilities, in her official capacity; W. REEVES
JOHNSON, JR., M.D., President of the Tennessee Board
of Medical Examiners, in his official capacity;
HONORABLE AMY P. WEIRICH, District Attorney
General of Shelby County, Tennessee, in her official
capacity; GLENN FUNK, District Attorney General of
Davidson County, Tennessee, in his official capacity;
CHARME P. ALLEN, District Attorney General of
Knox County, Tennessee, in her official capacity; and
TOM P. THOMPSON, JR., District Attorney General for
Wilson County, Tennessee, in his official capacity,

      Defendants.

CIVIL ACTION

CASE NO. 3:20-cv-00740

JUDGE CAMPBELL

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... I

TABLE OF AUTHORITIES ............................................................................................. II

I.      PRELIMINARY STATEMENT ............................................................................ 1

II.     STATEMENT OF FACTS ..................................................................................... 2

        A.      Plaintiffs' Provision of Medication Abortion in Tennessee ................................. 2

        B.      Existing Tennessee Abortion Requirements and the Act ....................................... 5

        C.      The Scientifically Unsupported Abortion Reversal Theory ................................... 7

        D.      The Impact of the Act ........................................................................................... 10

III.    ARGUMENT .......................................................................................................... 11

        A.      Applicable Legal Standards .................................................................................. 11

        B.      Plaintiffs Are Likely to Succeed on the Merits ..................................................... 12

                (i)     The Act Unconstitutionally Compels Speech That Undermines Informed
                        Consent ................................................................................................... 13

                (ii)    The Act's Compelled Speech is False, Misleading, and Not Relevant to
                        Decision-Making ..................................................................................... 17

                        1.      The Act's Mandatory Statements Are Untruthful ........................ 17

                        2.      The Act's Mandatory Statements Are Misleading ....................... 18

                        3.      The Act's Required Statements Are Irrelevant to a Patient's
                                Decision to Have an Abortion ...................................................... 20

                (iii)   The Act Violates Plaintiffs' and Their Patients' Equal Protection
                        Rights ....................................................................................................... 21

        C.      Absent an Injunction, Plaintiffs and Their Patients Will Suffer Irreparable
                Injury ..................................................................................................................... 23

        D.      An Injunction Would Not Harm Defendants and Would Serve the Public
                Interest ................................................................................................................... 24

IV.     CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*A Choice for Women v. Butterworth*,
    54 F. Supp. 2d 1148 (S.D. Fla. 1998) ............................................................................ 24

*Am. C. L. Union Fund of Mich. v. Livingston Cnty.*,
    796 F.3d 636 (6th Cir. 2015) ............................................................................... 12, 24

*Am. C. L. Union of Ky. v. McCreary Cnty., Ky.*,
    354 F.3d 438 (6th Cir. 2003) ............................................................................... 23

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*,
    698 F.3d 885 (6th Cir. 2012) ............................................................................... 25

*Am. Med. Ass'n v. Stenehjem*,
    412 F.Supp.3d 1134 (D. N.D. 2019) ............................................................. 12, 14, 20

*Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*,
    714 F.3d 424 (6th Cir. 2013) ............................................................................... 25

*Chamber of Com. of U.S. v. Edmondson*,
    594 F.3d 742, 771 (10th Cir. 2010) ............................................................................... 24

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985).................................................................................................. 22

*Dubay v. Wells*,
    506 F.3d 422 (6th Cir. 2007) ............................................................................... 22

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................................... 23

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
    920 F.3d 421 (6th Cir. 2019) ............................................................................... *passim*

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
    366 F.3d 754 (9th Cir. 2004) ............................................................................... 23

*Janus v. Am. Fed'n of State, Cnty., & Mun. Employees Council 31*,
    138 S. Ct. 2448 (2018).................................................................................................. 13

*Mass Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976).................................................................................................. 22

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    833 F.3d 656 (6th Cir. 2016) ............................................................................... 23

ii

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
    55 F.3d 1171 (6th Cir. 1995) ........................................................................ 25

*Nat'l Inst. of Fam. & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ........................................................................... *passim*

*Planned Parenthood Ariz., Inc. v. Brnovich*,
    No. CV-15-01022 (D. Ariz. Oct. 16, 2015) .............................................. 12

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
    822 F.2d 1390 (6th Cir. 1987) ...................................................... 23, 24, 25

*Planned Parenthood of Cent. N.J. v. Verniero*,
    41 F. Supp. 2d 478 (D. N.J. 1998) ........................................................... 24

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) ..................................................................... 15, 17, 20

*Planned Parenthood of Wis. v. Van Hollen*,
    963 F. Supp. 2d 858 (W.D. Wis. 2013) ................................................... 23

*Preterm-Cleveland v. Yost*,
    394 F.Supp.3d 796 (S.D. Ohio 2019) ................................................ 24, 25

*Reed v. Town of Gilbert*,
    576 U.S. 155, (2015) ................................................................................. 13

*Riley v. Nat'l Fed'n of the Blind of N. C., Inc.*,
    487 U.S. 781, (1988) ................................................................................. 13

*Romer v. Evans*,
    517 U.S. 620 (1996) .................................................................................. 22

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .................................................................................. 14

*Taubman Co. v. Webfeats*,
    319 F.3d 770 (6th Cir. 2003) ................................................................... 23

*Tulsa Women's Reprod. Clinic v. Hunter*,
    No. CV-2019-2176 (Okla. Dist. Ct. Oct. 29, 2019) ................................ 12

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) .................................................................................. 22

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) .................................................................................. 24

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .......................................................................................... 16

*Ward v. Polite*,
    667 F.3d 727 (6th Cir. 2012) .......................................................................... 16

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .......................................................................................... 13

**Statutes**

42 C.F.R. § 441.257 ..................................................................................................... 21

Tenn. Code Ann. § 29-26-118 ................................................................................... 5

Tenn. Code Ann. § 39-15-202 ................................................................................... 5

Tenn. Code Ann. § 39-15-215 ................................................................................... 5

Tenn. Code Ann. § 39-15-218 ........................................................................... *passim*

**Other Authorities**

*Can the Abortion Pill Be Reversed?* Abortion Pill Rescue (2020),
    abortionpillreversal.com/abortion-pill-reversal .............................................. 16

Complaint, *Am. Med. Ass'n v. Stenehjem*,
    No. 1:19-cv-125, 2019 WL 2601802 (D.N.D. June 25, 2019) .................... 7, 18

*Hearing on H.B. 2568 Before the H. Health Comm.*, 111th General Assembly (Mar. 10, 2020)
    (statement and questioning of Dr. Brent Boles, Medical Advisor to Abortion Pill Rescue
    Network) (starting at time 00:04:16)),
    http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=22077 ...................... 8

*Mifeprex Effectiveness and Advantages*, Danco Laboratories, https://www.earlyoptionpill.com/is-
    mifeprex-right-for-me/effectiveness-advantages/ (last visited Aug. 27, 2020). ................. 4

Mitchell D. Creinin et al., *Mifepristone Antagonization with Progesterone to Prevent Medication
    Abortion: A Randomized Controlled Trial*, 135 Obstetrics & Gynecology 158, 164......... 9

Stipulation to Dismiss, *Planned Parenthood Ariz.*, No. CV-15-0122 (D. Ariz. Aug. 18, 2016),
    ECF No. 133 ................................................................................................... 12

# I.    PRELIMINARY STATEMENT

This case concerns a law, Tenn. Code Ann. § 39-15-218 (effective October 1, 2020) ("the Act"), that compels physicians, upon threat of criminal prosecution and imprisonment, to provide their patients with inaccurate, misleading, and irrelevant information that a medication abortion can be "reversed." In so doing, the Act violates Plaintiffs' First Amendment rights by compelling them to endorse an unproven, potentially harmful medical treatment that the American College of Obstetricians and Gynecologists ("ACOG") and Society of Family Planning ("SFP") have found "no evidence" to support. Ex. 1, Declaration of Courtney A. Schreiber, M.D., M.P.H. ("Schreiber Decl.") Ex. D ("ACOG/SFP Guidelines") at 3. And alarmingly, the Act's mandated communications are so misleading as to undermine informed consent, giving women[1] the false impression that they need not be certain in their decision before beginning a medication abortion, because the process can be "reversed." The Act thus forces Plaintiffs to either breach their ethical obligations to patients or subject themselves to potential criminal, civil, and licensure penalties.

The Act also violates Plaintiffs' patients' Fourteenth Amendment rights to choose abortion without being subjected to statements that are untruthful, misleading, and irrelevant to their decision. Indeed, the Act's requirements actively impede the decision-making process and expose patients to potential harm. Finally, the Act violates Plaintiffs' and their patients' equal protection rights, by imposing harmful requirements not imposed on others similarly situated.

Patients rely on their doctors to tell them the truth and to provide accurate, non-misleading, and evidence-based medical information. If the government could compel physicians to mislead their patients with inaccurate medical statements about unproven treatments, it would undermine

---

[1] Plaintiffs use "woman," "women," "she," or "her" in this brief to refer to people who are or may become pregnant, but they note that people of all gender identities, including gender non-conforming people and transgender men, may also become pregnant and seek abortion services and would thus also suffer irreparable harm as a result of the Act.

1

the trust between patients and physicians. Public health and the integrity of the medical profession depend on patients being able to trust that their physicians are communicating honestly and in their best interest. Ex. 2, Declaration of Steven Joffe, M.D., M.P.H. ("Joffe Decl.") ¶ 18.

Plaintiffs therefore seek a temporary and/or preliminary injunction to preserve the status quo and prevent irreparable harm to themselves, their physicians and staff, and their patients. Absent intervention from this Court, the Act will go into effect on **October 1, 2020**.

## II.     STATEMENT OF FACTS

### A.     Plaintiffs' Provision of Medication Abortion in Tennessee

Plaintiffs Planned Parenthood of Tennessee and North Mississippi ("PPTNM"), Memphis Center for Reproductive Health ("CHOICES"), Knoxville Center for Reproductive Health ("KCRH"), and FemHealth USA, Inc., d/b/a carafem, operate health centers throughout Tennessee. Plaintiffs' health centers provide a full range of reproductive health services, including, *inter alia*, wellness visits; cancer screenings; human papillomavirus vaccines; annual gynecological exams; contraception; adoption referral; health-care services for lesbian, gay, and transgender individuals; miscarriage management; and abortion care, including medication abortion available through eleven weeks measured from the first day of a patient's last menstrual period ("LMP"). Ex. 3, Declaration of Melissa Grant ("Grant Decl"). ¶ 4; Ex. 4, Declaration of Ashley Coffield ("Coffield Decl.") ¶ 5; Ex. 5, Declaration of Corinne Rovetti ("Rovetti Decl.") ¶ 2; Ex. 6, Declaration of Rebecca Terrell ("Terrell Decl.") ¶ 9. Plaintiff Dr. Audrey Lance is a physician who provides health care including medication abortion care to patients in Tennessee at health centers operated by Plaintiff PPTNM. Ex. 7, Declaration of Audrey Lance, M.D., M.S. ("Lance Decl.") ¶ 2.

Abortion is one of the safest and most common medical procedures performed in the United States. Schreiber Decl. ¶ 16. Plaintiffs' patients seek abortions for a variety of medical,

2

psychological, emotional, familial, economic, and personal reasons. Lance Decl. ¶ 9; Terrell Decl. ¶ 12. Nationwide, nearly one in four women will obtain an abortion by age forty-five. Schreiber Decl. ¶ 16. Patients seeking abortions at or before seventy-seven days LMP generally can choose between a procedural abortion, which takes place in the health center, or a medication abortion, which involves only medicine and begins at the health center but can be completed at home. Coffield Decl. ¶¶ 6–7. Approximately 40–60% of Plaintiffs' abortion patients obtain medication abortions; Plaintiffs have observed an increasing preference for medication abortion during the COVID-19 pandemic, presumably because it requires less in-person contact than procedural abortion. Rovetti Decl. ¶ 2; Terrell Decl. ¶ 11; Coffield Decl. ¶ 7.

The most common form of medication abortion is a regimen of two prescription medications, mifepristone and misoprostol. *See* Schreiber Decl. ¶ 19. Mifepristone works by temporarily blocking the hormone progesterone, which is necessary to maintain pregnancy; by triggering the release of prostaglandins, which can cause uterine contractions; and by increasing the efficacy of misoprostol, the second medication in the regimen. *See id.* ¶¶ 21–22. Misoprostol, typically taken between twenty-four to forty-eight hours after mifepristone, causes the uterus to contract and expel its contents. *Id.* ¶ 22. The pregnancy is passed at a location of the patient's choosing—usually her home—in a process similar to miscarriage. *See id.* ¶¶ 19, 22. The combined use of these two medications is known collectively as "medication abortion," and its use is evidence-based for early pregnancy termination through eleven weeks (seventy-seven days) LMP. *Id.* ¶¶ 19, 23. Medication abortion is safe and highly effective, with an efficacy rate of up to 97.4%.[2] While mifepristone and misoprostol are each independently capable of terminating a pregnancy,

---

[2] Medication abortion has been shown to have a 97.4% efficacy rate when used up through ten weeks LMP. Schreiber Decl. ¶ 19. There is also evidence for the safe and effective use of medication abortion up through seventy-seven days LMP. *Id.*

the two-drug combined regimen is used for maximum efficacy and safety. *See* Schreiber Decl. ¶¶ 19–23, 61–62. Since 2000, more than four million patients in the United States have had a medication abortion.[3]

Consistent with their ethical obligations and values, Plaintiffs obtain informed consent from patients before providing any medical care, including abortion. Coffield Decl. ¶ 8; Grant Decl. ¶ 5; Lance Decl. ¶ 15; Rovetti Decl. ¶ 7; Terrell Decl. ¶ 13; *see* Joffe Decl. ¶¶ 19–23. As part of the informed consent process, Plaintiffs discuss with each patient accurate and relevant information to assist her with her decision whether to have an abortion and, if so, by which method. Coffield Decl. ¶¶ 8, 14; Grant Decl. ¶ 5; Lance Decl. ¶¶ 17–18; Rovetti Decl. ¶ 7; Terrell Decl. ¶ 13. Plaintiffs discuss all of the patient's options and alternatives (parenting, adoption, and abortion), the methods of abortion that are available to her, and the risks and benefits associated with each. Coffield Decl. ¶¶ 8, 11; Grant Decl. ¶ 5; Lance Decl. ¶ 17; Rovetti Decl. ¶ 7; Terrell Decl. ¶ 15. The goal of the informed consent process is for patients to have the information necessary to make the right decision for them. Coffield Decl. ¶ 9; Joffe Decl. ¶ 22; Grant Decl. ¶ 5; Lance Decl. ¶¶ 16–17; Rovetti Decl. ¶ 7; Terrell Decl. ¶ 13.

Plaintiffs advise each patient that the decision to have an abortion is hers alone to make, and not to start any abortion, medical or procedural, unless and until she is firm in her decision to terminate the pregnancy. Coffield Decl. ¶¶ 10–11; Grant Decl. ¶ 6; Lance Decl. ¶¶ 20–22; Rovetti Decl. ¶ 7; Terrell Decl. ¶ 14. Plaintiffs encourage patients to take the time they need to be certain in their decisions. Coffield Decl. ¶ 11; Lance Decl. ¶ 23. Prior to providing medication abortion, Plaintiffs counsel each patient to be certain in her decision before starting the regimen, given that

---

[3] *Mifeprex Effectiveness and Advantages*, Danco Laboratories, https://www.earlyoptionpill.com/is-mifeprex-right-for-me/effectiveness-advantages/ (last visited Aug. 27, 2020).

4

mifepristone alone will terminate a majority of pregnancies. Grant Decl. ¶ 10; Lance Decl. ¶ 22; Rovetti Decl. ¶ 10; Coffield Decl. ¶ 20; Terrell ¶ 14; *see* Schreiber ¶¶ 22, 24, 80. While most patients are already sure of their decision when they first come to the health center, in the rare instance that a patient is unsure, Plaintiffs will not provide an abortion (medication or procedural). Coffield Decl. ¶¶ 10–11; Terrell Decl. ¶ 14; Rovetti Decl. ¶ 10; Lance Decl. ¶¶ 21–22.

Plaintiffs' mission and core values dictate that they provide accurate, relevant information and evidence-based health care to all their patients. Coffield Decl. ¶¶ 8, 28; Grant Decl. ¶¶ 3, 8–9; Lance Decl. ¶¶ 24-26, 43; Rovetti Decl. ¶¶ 6, 8; Terrell Decl. ¶ 2.

### B.      Existing Tennessee Abortion Requirements and the Act

Existing Tennessee law requires physicians who provide medical treatments to first obtain voluntary and informed consent, consistent with recognized practice standards in the relevant medical specialty. Tenn. Code Ann. § 29-26-118. Separate from this generally applicable requirement, Tennessee also mandates that, before a patient can obtain an abortion, she must meet with a physician at least forty-eight hours beforehand and be told the probable gestational age of the pregnancy, the risks and benefits of abortion and childbirth, the alternatives to abortion, and the information, services, and agencies available to assist with adoption and parenting. *Id.* §§ 39-15-202(b), (d). Tennessee further requires that prior to an abortion, a physician or qualified technician must perform an ultrasound and, *inter alia*, display and describe the images to the patient in State-specified detail, and auscultate (*i.e.*, produce the sounds of) fetal cardiac activity if it is audible. *Id.* § 39-15-215(b).

The Act would radically alter Tennessee's existing generally applicable informed-consent requirements, as well as Plaintiffs' practices, by compelling Plaintiffs to convey scientifically unsupported and misleading information to their patients in three ways.

*First*, the Act compels Plaintiffs' physicians to inform patients at least forty-eight hours before a medication abortion, that "[i]t may be possible to reverse the intended effects of a chemical abortion utilizing mifepristone[4] if the woman changes her mind" and that "information on and assistance with reversing the effects of a chemical abortion utilizing mifepristone is available on the department of health website." *Id*. § 39-15-218(e).[5]

*Second*, the Act requires any waiting room and patient consultation room used by patients obtaining an abortion (whether medication or procedural) to "conspicuously" post signs "clearly visible to patients" with the following state-ordered text in large, boldfaced type: "Recent developing research has indicated that mifepristone alone is not always effective in ending a pregnancy. It may be possible to avoid, cease, or even reverse the intended effects of a chemical abortion utilizing mifepristone if the second pill has not been taken. Please consult with a healthcare professional immediately." *Id*. §§ 39-15-218(b), (c).

*Third*, after the mifepristone and misoprostol regimen is provided to the patient, the physician or physician's agent must provide written medical discharge instructions that include the same state-mandated statement about reversing medication abortion as is required on the signs. *Id.* § 39-15-218(f).

Violation of the Act is a Class E felony, punishable by one to six years in prison. *Id.* § 39-15-218(j).[6] In addition, Plaintiff clinics may be fined $10,000 per day if the Department of Health

---

[4] As defined by the Act, this refers to medication abortion. Tenn. Code Ann. § 39-15-218(a)(2).

[5] The Act further directs the Tennessee Department of Health to publish, by December 30, 2020, information "designed to inform the woman of the possibility of reversing the effects of a chemical abortion utilizing mifepristone if the woman changes her mind" and providing "information on and assistance with the resources that may be available to help reverse the effects of a chemical abortion." *Id.* §§ 39-15-218(h), (i).

[6] The Act specifies that penalties for failure to comply with the requirement that physicians refer patients to the Department of Health website for "reversal" information will not be assessed

6

determines they negligently failed to post the mandated sign. *Id.* § 39-15-218(k). Physicians who provide, or attempt to provide, a medication abortion without the state-mandated disclosures are also subject to actual and punitive damages in a lawsuit brought by the patient, the "father" of the embryo or fetus, or the parents of a minor patient or a deceased patient. *Id.* § 39-15-218(l).

### C. The Scientifically Unsupported Abortion Reversal Theory

There is no credible scientific evidence supporting the theory that medication abortion can be "reversed." Schreiber Decl. ¶¶ 25–55; Joffe Decl. ¶¶ 44–56. This theory originated from two physicians, Dr. George Delgado and Dr. Mary Davenport, who posit that administering high doses of progesterone after patients have taken mifepristone but before they have taken misoprostol can counteract the effects of mifepristone and thus "reverse" the abortion. Schreiber Decl. ¶ 25. However, after reviewing the medical evidence, both the American College of Obstetricians and Gynecologists ("ACOG")—the premier professional organization for OBGYNs—and the Society of Family Planning ("SFP") have recognized that "[t]here is no evidence that treatment with progesterone after taking mifepristone increases the likelihood of the pregnancy continuing." ACOG/SFP Guidelines at 3. Medical papers published over the last several years in highly respected journals, including a systematic review of the research on medication abortion "reversal," also conclude that this theory is unsupported. Schreiber Decl. ¶ 50; Schreiber Decl. Ex.'s F, G. The American Medical Association ("AMA") was so opposed to a law with mandated physician communications strikingly similar to the Act that it sued to enjoin the law. *See* Complaint, *Am. Med. Ass'n v. Stenehjem*, No. 1:19-cv-125, 2019 WL 2601802 (D.N.D. June 25, 2019).

---

"unless the department of health has made the information available on the website at the time the physician is required to inform the woman." Tenn. Code Ann. § 39-15-218(j).

Delgado and Davenport's theory is described in two ethically problematic papers[7] that contain serious methodological problems, making their purported conclusions wholly unreliable. Schreiber Decl. ¶¶ 25, 28–49, 52–55, 68–70; *see also* Joffe Decl. ¶¶ 46–54. Their 2012 paper describes outcomes from just six patients; their 2018 paper discusses data from 547 patients in various countries who took mifepristone, called an "abortion pill reversal" hotline Delgado helps run, and were referred to unknown providers who administered progesterone in varying amounts, via differing methods, and for varying durations.[8] *See* Schreiber Decl. ¶¶ 29, 34, 44, 56-57; Schreiber Decl. Ex.'s B, C. Neither paper was published in a respectable medical journal and neither appears to have undergone proper Institutional Review Board ("IRB")[9] vetting for ethical research on human subjects. Schreiber Decl. ¶¶ 30, 39–40; *see* Joffe Decl. ¶ 58–60.

Critically, neither paper used a control group of patients who took mifepristone and then received a placebo rather than progesterone treatments. Schreiber Decl. ¶¶ 31–32, 41–42. This is a major flaw, as mifepristone alone (without misoprostol) is known to frequently be insufficient to terminate a pregnancy. *Id*. ¶¶ 22, 24. Without a control group with which to compare the result of the experimental progesterone treatment, it is impossible to draw any inferences about whether the treatment had any effect (or the size of such effect, if any). *See id*. ¶¶ 35, 42. In fact, despite

---

[7] These studies were the subject of hearings concerning H.B. 2568 (which, as amended, is codified as the Act). *Hearing on H.B. 2568 Before the H. Health Comm.*, 111th General Assembly (Mar. 10, 2020) (statement and questioning of Dr. Brent Boles, Medical Advisor to Abortion Pill Rescue Network) (starting at time 00:04:16)), http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=22077.

[8] Indeed, Davenport and Delgado acknowledge that further research employing "randomized controlled trials comparing progesterone doses and routes of administration are needed" to "confirm" which protocol "is most efficacious." Schreiber Decl. Ex. C at 24. This makes their willingness to recommend the administration of two progesterone protocols at the end of the paper even more irresponsible and egregious.

[9] The professional norm and expectation is that research on human subjects should be approved by an IRB, which is a committee that performs an ethical review of proposed research and is designed to protect human subjects of research. Schreiber Decl. ¶ 40 n.35.

methodological flaws that likely inflated the rate of continuing pregnancy after "reversal" treatment, Schreiber Decl. ¶¶ 35–37, 43, 46–48, 51; Joffe Decl. ¶ 49 & n.14, Delgado and Davenport were *still* unable to show any statistically significant difference between the rate of continuing pregnancy with or without progesterone treatment, *see* Schreiber Decl. ¶¶ 49–50; *see also* Schreiber Decl. Ex. G at 1492.

The only scientifically controlled study of the effects of progesterone treatment after mifepristone, conducted in 2019 with IRB approval, was halted early due to serious safety concerns when a number of study participants experienced hemorrhage. *See* Schreiber Decl. ¶¶ 63–66. Because the study was halted early, the effect or lack thereof of progesterone treatment was not demonstrated, resulting instead in the conclusion that, due to a "void in high-quality research . . . such [reversal] treatment is experimental and should be offered only in [IRB]-approved human clinical trials to ensure proper oversight."[10] The study involved women who were willing to delay their abortions for two weeks for study purposes, took mifepristone, and were randomly assigned to take either progesterone or a placebo thereafter. *Id.* ¶ 64. The researchers halted the study after three of the twelve enrolled participants had to be transported to the emergency room by ambulance due to severe hemorrhage, with one requiring a blood transfusion. *Id.* ¶ 65. These patients came from both the progesterone and the placebo groups, suggesting that the hemorrhages were related the patients not having taken misoprostol, the second medication in a medication abortion regimen. *Id.* As a result, ACOG and SFP caution that "limited available evidence suggests that use of mifepristone alone without subsequent administration of misoprostol may be associated with an increased risk of hemorrhage." ACOG/SFP Guidelines at 3.

---

[10] Mitchell D. Creinin et al., *Mifepristone Antagonization with Progesterone to Prevent Medication Abortion: A Randomized Controlled Trial*, 135 Obstetrics & Gynecology 158, 164 (Jan. 2020).

### D.    The Impact of the Act

The Act requires Plaintiffs, their physicians and their staff to violate their ethics, values, and organizational missions, and potentially harm their patients. It does so in three primary ways.

*First*, the Act forces Plaintiffs and their physicians and staff to communicate inaccurate and misleading medical information to their patients. *See* Joffe Decl. ¶¶ 3, 34–37, 44–56; Schreiber Decl. ¶¶ 27, 38, 56–58, 71, 82. This requirement itself violates medical ethics, as it requires Plaintiffs' physicians and staff to communicate a message they *know* is scientifically unsupported and potentially harmful to patients. Joffe Decl. ¶¶ 25–31, 39–43, 56; Lance Decl. ¶¶ 37–43; Grant Decl. ¶ 8; Rovetti Decl. ¶ 6; Terrell Decl. ¶ 20. The Act thus harms patients, by forcing them to receive inaccurate and misleading medical information from their healthcare providers, and also undermines the relationship of trust between patient and provider which is crucial to the effective provision of medical care and the integrity of the medical profession. Joffe Decl. ¶¶ 18, 30–34, 39–43; Lance Decl. ¶¶ 19, 34.

*Second*, the Act forces Plaintiffs' physicians to undermine their patients' informed consent and decision-making, potentially resulting in severe harm to their patients. As detailed above in Section II.A, consistent with ethical informed consent practice, Plaintiffs emphasize to patients that they must come to a firm decision before beginning the abortion process because the first medication (mifepristone) will terminate a majority of pregnancies regardless of whether the second medication is taken. The Act forces Plaintiffs' physicians to directly contradict this message, and to do so in advance of the abortion. As a result, Plaintiffs' patients will have been told *both* that they must be firm in their decision before starting the abortion process, *and* that, should they not be, they can simply "reverse" the process later. Knowingly creating this kind of profound confusion is unethical and directly undermines the informed consent process. Joffe Decl. ¶¶ 26–28, 43.

*Third*, the Act forces Plaintiffs and their physicians and staff to unethically direct patients towards an unproven treatment that has not been demonstrated to be safe or effective and that may harm patients. When healthcare providers discuss a possible treatment with their patients, patients trust that the physician reasonably believes the treatment is safe, effective, and in the patient's best interest. *See* Lance Decl. ¶¶ 17–19. This trust is undermined by the Act. *Id*. ¶ 34. As noted above, the only scientifically controlled study on so-called reversal treatment was discontinued after three out of twelve patients hemorrhaged. *See supra* Section II.C. Moreover, the treatment involves administering large doses of progesterone for potentially substantial periods of time, which is not without risks. *See* Schreiber Decl. ¶¶ 29, 37, 59. In addition, the effects of the "reversal" protocol on ongoing pregnancy have not been adequately studied—neither the effects of large doses of progesterone, or of the combination of large doses of progesterone with misoprostol. *Id.* ¶ 60. Indeed, it is "almost impossible that it would be acceptable per current federal standards" concerning experimentation on pregnant women to even conduct an experiment with such regimen "without intensive safety and monitoring board oversight," *id.*, let alone to routinely direct patients to such treatment, as the Act requires, *id*. ¶ 27; Joffe Decl. ¶ 30. Notably, the Delgado and Davenport studies that purport to demonstrate the efficacy of "reversal" treatment appear to constitute unethical experimentation on human subjects. Schreiber Decl. ¶¶ 68–70; Joffe Decl. ¶¶ 57–62.

### III.    ARGUMENT

#### A.  Applicable Legal Standards

Plaintiffs seek a temporary restraining order and/or preliminary injunction to prevent the Act from inflicting constitutional, medical, ethical, and other harm on Plaintiffs and their patients. In ruling on such a motion, the court considers: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the

injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. C. L. Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (internal quotation marks omitted).

As set out below and in the accompanying declarations, Plaintiffs meet the test.

### E. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are highly likely to prevail on their First and Fourteenth Amendment claims. The Act infringes on Plaintiffs' First Amendment rights by compelling them to speak a state-mandated message about an experimental medical practice that has not been proven safe or effective and that "does not facilitate informed consent." *Nat'l Inst. of Fam. & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2373–74 (2018); *see also EMW Women's Surgical Ctr., P.S.C. v. Beshear* ("*EMW*"), 920 F.3d 421, n.6 (6th Cir. 2019), *cert. denied sub nom. EMW Women's Surgical Ctr., P.S.C. v. Meier*, 140 S. Ct. 655 (2019). The Act further violates Plaintiffs' First Amendment rights and Plaintiffs' patients' Fourteenth Amendment rights because the Act's state-mandated message is untruthful, misleading, and not relevant to the decision whether to have an abortion. Moreover, the Act unconstitutionally singles out Plaintiffs and their patients for differential treatment compared with others similarly situated, in violation of the Fourteenth Amendment's guarantee of equal protection.

The only two other courts to consider similar laws have preliminarily enjoined them. *See Am. Med. Ass'n v. Stenehjem,* 412 F.Supp.3d 1134 (D.N.D. 2019); Journal Entry of Judgment, *Tulsa Women's Reprod. Clinic v. Hunter*, No. CV-2019-2176 (Okla. Dist. Ct. Oct. 29, 2019).[11]

---

[11] A third court also entered a preliminary injunction against an Arizona law mandating an identical disclosure. Order Granting Prelim. Inj. & Vacating Hr'g, *Planned Parenthood Ariz., Inc. v. Brnovich*, No. CV-15-01022 (D. Ariz. Oct. 16, 2015), ECF No. 107. In that case, the State stipulated to the injunction before preliminary discovery; thereafter, the Arizona legislature repealed the challenged law. Stipulation to Dismiss, *Planned Parenthood Ariz. v. Brnovich*, No. CV-15-0122 (D. Ariz. Aug. 18, 2016), ECF No. 133.

12

1.    (i)    **The Act Unconstitutionally Compels Speech That Undermines Informed Consent**

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), and requires the presumption "that speakers, not the government, know best both what they want to say and how to say it," *Riley v. Nat'l Fed'n of the Blind of N. C., Inc.*, 487 U.S. 781, 790–91 (1988). In recent years, the Supreme Court has further emphasized the "damage" done when "individuals are coerced into betraying their convictions" through compelled speech. *Janus v. Am. Fed'n of State, Cnty., & Mun. Employees Council 31*, 138 S. Ct. 2448, 2464 (2018). As noted above, *see supra* Section II.A, the Act would force Plaintiffs to violate their core ethics, values, and principles, which center evidence-based medicine, patient-centered healthcare, and the provision of accurate, scientifically sound information.

A statute that "compel[s] individuals to speak a particular message . . . 'alter[s] the content of their speech.'" *NIFLA*, 138 S. Ct. at 2371 (internal alterations and quotations omitted). Such content-based restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In particular, the Supreme Court has held that a compelled speech statute is unconstitutional where "licensed clinics must provide a government-drafted script about the availability of . . . services, as well as contact information about how to obtain them." *NIFLA*, 138 S. Ct. at 2371.

The Supreme Court has recognized narrow exceptions to this prohibition on content-based speech regulation where a state "regulate[s] professional conduct that incidentally involves speech" by requiring physicians to provide information necessary to obtain informed consent for a medical procedure. *NIFLA*, 138 S. Ct. at 2366, 2377; *EMW* 920 F.3d at 428–29. However,

13

"[s]peech is not unprotected merely because it is uttered by 'professionals'" such as physicians. *NIFLA*, 138 S. Ct. at 2371–72. Indeed, the Supreme Court has "stressed the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'" *Id.* at 2374 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011)).

Where a law compels physicians to communicate messages that "do[] not facilitate informed consent to a medical procedure" and "provide[] no information about the risks or benefits" of the procedure, the regulation does not meet the narrow exception for speech restrictions incidental to the regulation of professional conduct.[12] *See NIFLA*, 138 S. Ct. at 2373–74; *see also EMW*, 920 F.3d at n.6. In considering a statute similar to the one at issue here, a federal district court in North Dakota found that the statute "violates the First Amendment rights of physicians" because, *inter alia*, it "undermines informed consent and the standard of care" and does not "focus on relevant medical information designed to assist a woman in making a free choice." *See Am. Med. Ass'n*, 412 F.Supp.3d at 1150.

The statute in *NIFLA* required certain licensed clinics to "inform women how they can obtain state-subsidized abortions," even though the clinics did not provide abortions and actively sought to dissuade women from having abortions. *NIFLA*, 138 S. Ct. at 2371. The Supreme Court struck the statute down because the mandated information "d[id] not facilitate informed consent to a medical procedure" and provided "no information about the risks or benefits" of any procedure. *Id.* at 2373–74; *EMW*, 920 F.3d at 437–38 ("[T]he very reason that the required disclosure in *NIFLA* did 'not facilitate informed consent' was because it *provided* no information about the risks or benefits of a medical procedure." (quoting *NIFLA* 138 S. Ct. at 2373)).

---

[12] Nor does the Act fall within the only other exception identified in *NIFLA* for commercial speech related to "purely factual and uncontroversial information." *See NIFLA*, 138 S. Ct. at 2372 (internal citations omitted).

14

The Act here similarly mandates speech that does "not facilitate informed consent" because it does not inform patients "about the nature of the [medication abortion] procedure, the attendant health risks and those of childbirth, [or] the probable gestational age of the fetus." *EMW*, 920 F.3d at 427 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 882 (1992) (internal quotation marks omitted)). Rather, the statements compelled by the Act relate to an entirely different and medically unsupported treatment—medication abortion "reversal"—that Plaintiffs do not provide and that their patients are not seeking. And while it is central to the mission of Plaintiffs' medical practices to provide evidence-based information and health care to their patients, *see supra* Section II.B, the Act forces Plaintiffs to make statements and endorse treatments contrary to medical evidence—"the very practice that [Plaintiffs] . . . oppos[e]." *NIFLA*, 138 S. Ct. at 2371.

The Act is in stark contrast with the information required by the informed consent statute upheld by the Supreme Court in *Casey*, which was "aimed at ensuring a decision [to have an abortion] that is mature and informed." *Casey*, 505 U.S. at 883; *see also EMW*, 920 F.3d at 442 (noting that the law analyzed in *Casey* "furthers the State's legitimate interest . . . of ensuring that the patient understands the full implications of her decision"). The Court further noted that the statute at issue in *Casey* "further[ed] the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later . . . that her decision was not fully informed." *EMW*, 920 F.3d at 442 (quoting *Casey*, 505 U.S. at 882).

The Act here will, if anything, do the opposite, *increasing* the risk that a woman will start the medication abortion process under the misimpression that "it may be possible to reverse" the procedure if she "changes her mind," only to discover later that this was not the case and that her pregnancy has been terminated. Tenn. Code. Ann. § 39-15-218(e)(1). In so doing, the Act actively

15

*impedes* informed consent by undermining Plaintiffs' counseling of patients that they must be certain in their decision before starting a medication abortion. Joffe Decl. ¶¶ 32-38, 63; Schreiber Decl. ¶¶ 79–82; *see also supra* Section II.A.

Indeed, far from being an informed consent statute, the Act constitutes "the most aggressive form of viewpoint discrimination—compelling an individual 'to utter what is not in her mind' and indeed what she might find deeply offensive." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943) (internal alterations omitted)). As such, the Act is subject to the "stringent standard" of strict scrutiny: justifiable "only if the government proves that [it is] narrowly tailored to serve compelling state interests." *NIFLA*, 138 S. Ct. at 2371. The Act fails this test. If the state wishes to inform women of the supposed "reversibility" of medication abortions, "[m]ost obviously, it could inform the women itself with a public-information campaign" and "could even post the information on public property." *Id.* at 2376. There is no justification for, instead, "co-opt[ing] [Plaintiffs] to deliver its message for it." *Id.* Because the Act compels Plaintiffs to communicate a message they oppose,[13] and further because such a message impedes, rather than facilitates, informed consent, the Act is an unconstitutional content-based speech restriction.

---

[13] The Act further requires Plaintiffs to refer all medication abortion patients to the Tennessee Department of Health website, which in turn is required to post "information on and assistance with the resources that may be available to help reverse the effects of a chemical abortion." Tenn. Code Ann. § 39-15-218(h). While Plaintiffs do not yet know what the Department of Health intends to put on its website, the only such "resource" of which Plaintiffs are aware is the Abortion Pill Rescue Network. Coffield Decl. ¶ 27. That organization's website, in turn, is rife with medical misinformation. *See, e.g.*, *Can the Abortion Pill Be Reversed?* Abortion Pill Rescue (2020), abortionpillreversal.com/abortion-pill-reversal ("Can the abortion pill be reversed? The simple answer is yes! If done in time. There is an effective process called abortion pill reversal that can . . . allow you to continue your pregnancy, but time is of the essence.").

16

**2. (ii) The Act's Compelled Speech is False, Misleading, and Not Relevant to Decision-Making**

Regardless of whether the Act is an informed-consent law, it is still unconstitutional because it forces physicians to give, and patients to receive, information that is untruthful, misleading, and not relevant to their decision to choose whether to have an abortion. As the Sixth Circuit has made clear, an informed-consent law "should be upheld *so long as* the disclosure is truthful, non-misleading," and "relevant to the patient's decision whether to undertake the procedure." *EMW*, 920 F.3d at 424, 428 (emphasis added) (citing *Casey*, 505 U.S. at 882); *see also NIFLA*, 138 S. Ct. at 2373–74 ("Doctors help patients make deeply personal decisions, and their candor is crucial.") (internal quotations and citations omitted). Thus, even if the Act could be considered an informed consent law, which it cannot, it would nonetheless violate both Plaintiffs' First Amendment rights against compelled speech and their patients' Fourteenth Amendment rights under *Casey*.

*a. The Act's Mandatory Statements Are Untruthful*

As discussed extensively above and in detail in Plaintiffs' expert declarations, there exists no treatment that has been demonstrated to "reverse," "cease," or "avoid" the effects of mifepristone taken as part of a medication abortion. *See supra* Section II.C. The "reversal" theory has been put forth in two ethically-problematic and methodologically flawed papers, both of which have been rejected by the mainstream medical community. *See supra* Section II.C. These papers, by Drs. Delgado and Davenport, concern individuals who called an abortion "reversal" hotline run by Abortion Pill Rescue, an organization of which Dr. Delgado is listed as a Founder and Medical Advisor. *See* Schreiber Decl. Ex. C at 24; *see also* Schreiber Decl. ¶ 57. These patients were then referred to unknown practitioners in unknown locations around the world, who were given differing doses of progesterone, over different periods of time, and by different methods of

17

administration. *See* Schreiber Decl. ¶¶ 37, 44; *see also* Schreiber Decl. Exs. B, C. While the Delgado and Davenport's analyses suffer from substantial methodological flaws that would result in an *overestimation* of the supposed efficacy of "reversal"—such as screening out patients whose pregnancies had already been terminated after taking mifepristone—they nevertheless were unable to show a significant difference between the effects of "reversal" treatment after mifepristone and the effects of mifepristone alone. Schreiber Decl. ¶¶ 35–37, 43, 46–51; *see also* Schreiber Decl. Ex. G at 3.

Indeed, ACOG and SFP have unequivocally confirmed that there is "no evidence" that medication abortion "reversal" treatments have *any* effect other than to possibly increase the risk of hemorrhage. ACOG/SFP Guidelines at 2; *see also* Schreiber Decl. ¶¶ 26, 50, 65–66; Schreiber Decl. Ex. G. Indeed, ACOG has been vocal that "[c]laims regarding abortion 'reversal' treatment are not based on science and do not meet clinical standards," and thus ACOG "does not support prescribing progesterone to stop a medical abortion." Schreiber Decl. Ex. E at 1. The AMA was similarly so opposed to having to provide such patently false information to patients that it sued North Dakota to enjoin a law virtually identical to the Act. *See* Complaint at 2, *Am. Med. Ass'n*, 2019 WL 2601802 ("the Compelled Reversal Mandate . . . force[s] physicians to speak medically inaccurate messages"); *id.* at 18 ("the Compelled Reversal Mandate . . . compels Physicians to lie to their patients").

        *b.*    *The Act's Mandatory Statements Are Misleading*

The Act's compelled statements are also highly misleading, with the potential to cause severe harm to patients. The Act creates a serious and unacceptable risk that a patient will be misled into believing that a medication abortion can be "reversed" once begun and thus that she may take mifepristone and thereby terminate her pregnancy before she is certain in her decision. Schreiber Decl. ¶¶ 79–82; Joffe Decl. ¶¶ 32–34, 37; Coffield Decl. ¶ 22; Lance Decl. ¶ 35. The

18

Act also threatens to mislead patients into believing that medication abortion itself is less effective than it has been proven to be, and thus may compel patients to choose procedural abortion despite otherwise preferring medication abortion. Coffield Decl. ¶ 24. Plaintiffs have an ethical obligation not to mislead their patients at all, let alone when doing so may have such harmful consequences. *See supra* Section II.D.

The Act's requirements will further mislead patients into believing that their physicians are endorsing as sound medical practice what, in reality, is an unproven and potentially harmful treatment. *See supra* Section II.C; Schreiber Decl. ¶¶ 59–60, 63–70, 75. Because of the lack of scientific support, "reversal" treatment has been rejected as not evidence-based by the general medical community and is not generally offered by medical practitioners. *See* Lance Decl. ¶ 39.

The dubious nature of this "reversal" practice and the practitioners willing to offer it is demonstrated by the experience of a patient of Plaintiff KCRH, who, after taking mifepristone as part of a medication abortion, saw a sign promoting so-called "reversal" treatments. Rovetti Decl. ¶ 12. Feeling suddenly overwhelmed, she called the number provided, where she was pressured to immediately visit an address and obtain "reversal" treatment. *Id.* The patient arrived at the address to discover she had not been referred to a medical office, but rather to the residential home of a man who administered an injection and then instructed her to not take the second medication abortion pill. *Id.* ¶ 13. The patient's pregnancy did not continue. *Id.* ¶ 14. The patient was so upset by the entire experience that she called Plaintiff KCHR's offices crying, expressing her profound distress that she had been pressured to seek "treatment" at the home of someone she knew nothing about, rather than taking the second medication abortion drug. *Id.*

19

c. *The Act's Required Statements Are Irrelevant to a Patient's Decision to Have an Abortion*

As discussed *supra* at Section III.B(ii), information about how to "reverse" an abortion is not "relevant to the patient's decision whether to undertake the procedure." *EMW*, 920 F.3d at 428. The Act's mandated information does not concern the risks or benefits of, or alternatives to, having an abortion, but rather constitutes misleading statements about the efficacy of an entirely *different* medical procedure that Plaintiffs do not provide or recommend and the patient is not seeking. Not only is this information unrelated to the decision to have an abortion, but that decision itself must be made based on an understanding that the abortion is intended to be, and in a majority of cases *will* be, effective and irreversible—an understanding that is directly undermined by the mandated information. Schreiber Decl. ¶¶ 79–81; Joffe Decl. ¶¶ 32–33.

Moreover, the Act requires that signs with misleading statements about reversal be posted in any waiting room and procedure room that any abortion patient might use. Thus, Plaintiffs are required to communicate these false and misleading statements to many patients who are not seeking a medication abortion or an abortion at all. Coffield Decl. ¶ 23; Grant Decl. ¶ 12; Rovetti Decl. ¶ 9; Terrell Decl. ¶ 24. Indeed, patients obtaining procedural abortions may well also be misled by the Act's mandatory signage, as they may not understand exactly what a "chemical abortion utilizing mifepristone" means and whether it applies to them. Coffield Decl. ¶ 23.

In short, the Act's requirements are untruthful, misleading, and irrelevant to the decision to have an abortion, and are thus unconstitutional under the First and Fourteenth Amendments. *See EMW*, 920 F.3d at 424, 428 (emphasis added) (citing *Casey*, 505 U.S. at 882). A federal district court in North Dakota preliminarily enjoined a law requiring state-mandated information almost identical to the Act, holding that the mandated information was "untrue," "devoid of scientific support," and "misleading." *Am. Med. Ass'n*, 412 F.Supp.3d at 1150.

### 3. (iii) The Act Violates Plaintiffs' and Their Patients' Equal Protection Rights

The Act is also unconstitutional because it violates the equal protection rights of Plaintiffs and their staff and physicians, as well as their patients, by imposing burdens on them that are not imposed upon others similarly situated. The Act requires providers to undermine their patients' informed consent to an abortion through state-compelled provision of inaccurate information—a requirement not imposed on providers or patients in *any* other medical context.

The Act requires physicians and health centers to communicate to medication abortion patients that their procedure "may be . . . revers[ible]," despite there being no evidence to support such statement. Tennessee does *not*, however, require physicians providing sterilization procedures to undermine *their* patients' informed consent by communicating that the sterilization procedure "may be . . . reverse[ible]." Yet, sterilization procedures, unlike medication abortions, *are* reversible a significant percentage of the time. *See* Joffe Decl. ¶¶ 35–36. Nevertheless, as with abortion, ethical informed consent practice requires that healthcare providers communicate to the patient that the sterilization procedure is intended to be permanent, because while sterilization may be reversible for many, any individual patient runs the risk that the procedure will be permanent.

Indeed, this understanding of the requirements for ethical informed consent—that physicians emphasize the permanence of sterilization procedures, even though they may not be permanent for everyone—is reflected in federal Medicaid regulations concerning federally-subsidized sterilization procedures. 42 C.F.R. § 441.257 (1)(iii). Tennessee has not required that the ethical informed consent process for sterilization be undermined by any required countervailing disclosures concerning the reversibility of sterilization procedures.

Nor are sterilization patients—or any patients other than medication abortion patients—required to be misled about and steered towards unproven treatments of questionable safety. *See,*

21

*e.g.*, Grant Decl. ¶ 13; Rovetti Decl. ¶ 15; Terrell Decl. ¶ 29; *see also* Schreiber Decl. ¶¶ 68–70; Joffe Decl. ¶ 38. Tennessee forces such unethical and harmful requirements only on medication abortion patients and their healthcare providers.

While heightened scrutiny should apply where states are singling out abortion over other procedures,[14] Tennessee's differential treatment of providers and patients of medication abortion cannot withstand even rational basis scrutiny. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [the Court] insist[s] on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). "[R]equiring that the classification bear a rational relationship to an independent and legitimate legislative end . . . ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633; *accord City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448–50 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

The Act's singling out of medication abortion is not rationally related to any legitimate state interest. By misleading patients into believing that their decision to have an abortion need not be final, and promoting experimental treatments rejected by mainstream medicine, the Act cannot reasonably be said to advance a state interest in fetal life or childbirth. Indeed, the misleading nature of the Act's requirements actually *increases* the chances that someone will terminate a pregnancy before she has fully decided to do so. For the same reasons, the Act cannot be said to

---

[14] Because the Act interferes with the exercise of the fundamental right to abortion, it should be reviewed under strict scrutiny. *See Mass Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 & n.3 (1976) (noting that the right to an abortion is a "fundamental right," and that classifications burdening fundamental rights are reviewed under strict scrutiny); *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002) ("When a statute regulates certain 'fundamental rights' (*e.g.* voting or abortion) . . . the statute is subject to 'strict scrutiny.'" (citation omitted) (emphasis in original)). "Under strict scrutiny, a regulation infringing upon a fundamental right will only be upheld if it is narrowly tailored to serve a compelling state interest." *Dubay v. Wells*, 506 F.3d 422, 429 (6th Cir. 2007).

22

advance any interest in women's health or decisional certainty. When there is "no rational relationship to any of the articulated purposes of the state, [the court is] left with the more obvious illegitimate purpose." *Craigmiles v. Giles*, 312 F.3d 220, 228 (6th Cir. 2002) (applying rational basis review to strike down licensing requirement as "inapposite and counterproductive" to the state's asserted interest).

## F. Absent an Injunction, Plaintiffs and Their Patients Will Suffer Irreparable Injury

Plaintiffs and their patients will suffer irreparable harm unless the Act is enjoined. The deprivation of constitutional rights unquestionably constitutes irreparable injury. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Am. C. L. Union of Ky. v. McCreary Cnty.*, *Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) ("[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated."); *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016); *Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).

The Act further threatens to harm patients by impeding informed consent, directing them to an unproven and potentially unsafe treatment, and undermining their trust in their healthcare providers. *See supra* Sections II.C, D. These threats to Plaintiffs' patients' health and wellbeing, as well as their constitutional rights, constitute irreparable harm. *See, e.g.*, *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) (finding likelihood of irreparable harm where delayed medical treatment would cause pain, complications, and other adverse effects); *Planned Parenthood of Wis. v. Van Hollen*, 963 F. Supp. 2d 858, 868 (W.D. Wis. 2013) (holding

that an abortion restriction caused irreparable harm to patients by *inter alia* imposing increased health risks through delay).

The threat of the Act's onerous penalties, including confinement in jail, licensure penalties, and civil penalties of $10,000 per day, likewise constitutes irreparable harm. *See, e.g.*, *A Choice for Women v. Butterworth*, 54 F. Supp. 2d 1148, 1158 (S.D. Fla. 1998); *Planned Parenthood of Cent. N.J. v. Verniero*, 41 F. Supp. 2d 478, 504 (D. N.J. 1998), *aff'd sub nom Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127 (3d Cir. 2000).

### G. An Injunction Would Not Harm Defendants and Would Serve the Public Interest

As set forth above, Plaintiffs and their patients will suffer serious harm without an injunction, whereas Defendants only stand to temporarily lose the ability to enforce a law that is not in effect, does not serve any state interest, and is likely to be held unconstitutional. *See Planned Parenthood Ass'n of Cincinnati*, *Inc.*, 822 F.2d at 1400 (finding it "questionable" whether state "has any 'valid' interest in enforcing" an unconstitutional law); *see also Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) (noting that defendant "does not have an interest in enforcing a law that is likely constitutionally infirm"). Where Plaintiffs' requested relief will simply preserve the status quo, the balance of equities tips in favor of an injunction. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Preterm-Cleveland v. Yost*, 394 F.Supp.3d 796, 803 (S.D. Ohio 2019). The balance of harm thus weighs decisively in Plaintiffs' favor.

Finally, granting an injunction in this case will serve the public interest. As the Sixth Circuit has made clear, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. C. L. Union Fund of Mich*., 796 F.3d at 649 (alteration in original)

(internal quotation marks omitted); *see also Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 896 (6th Cir. 2012); *Planned Parenthood Ass'n of Cincinnati,* 822 F.2d at 1400 ("[T]he public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional.").

It is also unquestionably in the public interest, especially during a global pandemic, to protect people's ability to trust that their doctors are providing truthful, evidence-based medicine, rather than becoming mere government mouthpieces for unscientific viewpoints. The only way to prevent the public harm resulting from this far-reaching, ongoing constitutional violation is to enjoin enforcement of the Act.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for a temporary restraining order and/or preliminary injunction should be granted. Defendants should be enjoined from enforcing the Act pending the final determination of Plaintiffs' claims.[15]

Dated: September 1, 2020

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Thomas Castelli*
Thomas H. Castelli (No. 24849)
Stella Yarbrough (No. 33637)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

</div>

---

[15] Because Plaintiffs and their patients face a loss of constitutional rights, and Defendants are not faced with any monetary injury if a preliminary injunction is issued, this Court should exercise its discretion to waive the Fed. R. Civ. P. 65(c) bond requirement. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (affirming district court decision to require no bond "because of the strength of [the plaintiff's] case and the strong public interest involved"); *Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 804 (S.D. Ohio 2019) (waiving bond).

25

syarbrough@aclu-tn.org

*Attorneys for Plaintiffs*

Christine Clarke*
Jennifer Sandman*
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
Tel: (212) 261-4749
Tel: (212) 261-4405
Fax: (212) 247-6811
christine.clarke@ppfa.org
jennifer.sandman@ppfa.org

*Attorneys for Plaintiffs Planned Parenthood of Tennessee and North Mississippi and Audrey Lance, M.D., M.S.*

Andrew Beck*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
abeck@aclu.org

*Attorneys for Plaintiffs Knoxville Center for Reproductive Health and FemHealth USA, Inc.*

Michelle Moriarty*
Center for Reproductive Rights
199 Water St., 22nd Floor
New York, NY 10038
Tel: (917) 637-3695
mmoriarty@reprorights.org

Marc Hearron*
Center for Reproductive Rights
1634 Eye St., N.W., Suite 600
Washington, DC 20006
Tel: (202) 524-5539
mhearron@reprorights.org

*Attorneys for Plaintiff Memphis Center for Reproductive Health*

*Application for admission *pro hac vice* forthcoming

26

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on September 1, 2020, a true and correct copy of the foregoing has been served by e-mail according to the agreement and instructions from the Attorney General's Office to tnattygen@ag.tn.gov and on the Attorney for Defendants listed below.

ALEXANDER S. RIEGER
Assistant Attorney General
Office of the Attorney General
Public Interest Division
P.O. Box 20207
Nashville, TN 37202
(615) 741-2408
Alex.Rieger@ag.tn.gov

*/s/ Thomas Castelli*
Thomas H. Castelli (No. 24849)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

*Attorney for Plaintiffs*

27