IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PLANNED PARENTHOOD OF
TENNESSEE AND NORTH MISSISSIPPI;
*et al.*,

    Plaintiffs,

v.

HERBERT H. SLATERY III, Attorney
General of Tennessee; *et al.*,

    Defendants.

CIVIL ACTION
CASE NO. 3:20-cv-00740
JUDGE CAMPBELL
MAGISTRATE JUDGE NEWBERN

**PLAINTIFFS' MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I. PLAINTIFFS HAVE THIRD PARTY STANDING ............................................................ 1

II. THE ACT IS NOT AN INFORMED CONSENT STATUTE .......................................... 2

III. THE ACT'S STATEMENTS ARE UNTRUE, MISLEADING, AND IRRELEVANT ... 5

IV. THE ACT VIOLATES EQUAL PROTECTION............................................................ 10

V. DECLARATIONS SUBMITTED BY DEFENDANTS DO NOT MITIGATE THE
ACT'S HARMS................................................................................................................ 11

VI. PHYSICIAN DISAVOWAL CANNOT NEGATE THE ACT'S HARMS..................... 13

VII. CONCLUSION................................................................................................................. 14

i

# TABLE OF AUTHORITIES

## Cases

*729, Inc. v. Kenton Cnty. Fiscal Court*,
 515 F.3d 485 (6th Cir. 2008) .................................................................................... 4

*City of Cleburne v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985) ................................................................................................ 11

*Cole v. City of Memphis*,
 97 F. Supp. 3d 947 (W.D. Tenn. 2015) .................................................................... 4

*EMW Women's Surgical Ctr., P.S.C. v. Friedlander*,
 960 F.3d 785 (6th Cir. 2020) .................................................................................... 1

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
 920 F.3d 421 (6th Cir. 2019) ............................................................................ *passim*

*Gonzales v. Carhart*,
 550 U.S. 124 (2007) .................................................................................................. 9

*June Med. Servs. L.L.C. v. Russo*,
 140 S. Ct. 2103, 2118 (2020) .................................................................................... 1

*Memphis Ctr. for Reproductive Health v. Slatery*,
 No. 3:20-cv-00501, 2020 WL 4274198 (M.D. Tenn. 2020) .................................... 1

*MKB Mgmt. Corp. v. Burdick*,
 855 N.W.2d 31 (N.D. 2014) ..................................................................................... 9

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
 138 S. Ct. 2361 (2018) ..................................................................................... *passim*

*Planned Parenthood Ariz., Inc. v. Brnovich*,
 172 F. Supp. 3d 1075 (D. Ariz. 2016) ...................................................................... 2

*Planned Parenthood Ark. & E. Okla. v. Jegley*,
 4:15-cv-00784, 2018 WL 3029104 (E.D. Ark. 2018) .............................................. 9

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
 530 F.3d 724 (8th Cir. 2008) .................................................................................. 13

*Planned Parenthood Se. Pa. v. Casey*,
 505 U.S. 833 (1992) .............................................................................................. 2, 7

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
 411 U.S. 1 (1973) ...................................................................................................... 4

*Stuart v. Loomis*,
    992 F. Supp. 2d 585 (M.D.N.C. 2014) ............................................................................... 2

*Tagami v. City of Chi.*,
    875 F.3d 375 (7th Cir. 2017) ............................................................................................ 4

*United States v. O'Brien*,
    391 U.S. 367 (1968) .......................................................................................................... 4

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) ...................................................................................................... 9

**Statutes**

Ariz. Rev. Stat. § 36-2153. .................................................................................................... 8

Tenn. Code Ann. § 39-15-218 ....................................................................................... *passim*

**Other Authorities**

*About Us*, ACOG, https://www.acog.org/about (last visited Sept. 23, 2020) ............................. 11

Complaint, *Am. Med. Ass'n v. Stenehjem*,
    No. 1:19-cv-125 (D.N.D. June 25, 2019), ECF No. 1 ...................................................... 11

*HB 2568,* Tennessee General Assembly ("Summary" Tab),
    http://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB2568&ga=111
    (last visited September 23, 2020) .................................................................................... 14

*Hearing on H.B. 2568 Before the H. Pub. Health Subcomm.,* 111th Gen. Assemb. (Feb. 25, 2020)
    (statement and questioning of Rep. Jeremy Faison, Chairman, H. Republican Comm.)
    (starting at time 00:23:23) ............................................................................................... 14

Defendants do not defend the Act as written, but instead seek to redefine it and thus elide the Act's grave and foreseeable harms. Defendants offer no justification for undermining informed consent to an abortion by requiring Plaintiffs' staff and physicians, upon threat of felony criminal prosecution, to provide false, misleading, and irrelevant statements to patients.

I. **PLAINTIFFS HAVE THIRD PARTY STANDING**

As this Court explained less than two months ago, "[t]he Supreme Court has long established that abortion providers have standing to assert their patients' rights." *Memphis Ctr. for Reproductive Health v. Slatery*, No. 3:20-cv-00501, 2020 WL 4274198, at *13 (M.D. Tenn. July 24, 2020). Both the Supreme Court and the Sixth Circuit have in recent months reaffirmed this principle in decisions Defendants fail to mention. *See June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2118–19 (2020) (plurality opinion); *id.* at 2139 n.4 (Roberts, C.J., concurring); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 794 n.2 (6th Cir. 2020).

Defendants claim that abortion providers lack standing because they and their patients have "divergen[t]" interests. Resp. Opp'n Pls.' Mot. TRO/Prelim. Inj. ("Defs.' Br.") 12, ECF No. 16. This argument has also been rejected by both the Supreme Court and the Sixth Circuit. *See June Med. Servs.*, 140 S. Ct. at 2119 (explaining that this argument is "a common feature of cases in which we have found third-party standing"); *EMW*, 960 F.3d at 794 n.2 (noting the Supreme Court "has found that [abortion] providers have standing even when their interests are arguably in potential conflict with patients'"). In any event, no such "divergence" of interests exists, as the Act harms patients directly by subjecting them to false and misleading statements and by undermining informed consent. *See* Mem. Law Supp. Mot. TRO/Prelim. Inj. ("Pls.' Br.") 10, 15–16, ECF No. 6; *see also* Pls.' Br. Ex. 1, Decl. of Courtney A. Schreiber M.D., M.P.H. ("Schreiber Decl.") ¶¶

1

72, 79–82, ECF No. 6-1; Pls.' Br. Ex. 2, Decl. of Steven Joffe M.D., M.P.H. ("Joffe Decl.") ¶¶ 32–38, ECF No. 6-2.

Defendants' final standing argument—that providers have third-party standing to challenge only barriers to abortion access, but no other laws affecting abortion patients (*see* Defs.' Br. 11–12)—also has no merit. Indeed, *Planned Parenthood of Southeastern Pennsylvania v. Casey* concerned physician challenges to a physician disclosure requirement, 505 U.S. 833, 881 (1992), and courts have routinely found provider standing in such cases, *see, e.g.*, *Planned Parenthood Ariz., Inc. v. Brnovich*, 172 F. Supp. 3d 1075, 1092–93 (D. Ariz. 2016) ("summarily reject[ing]" the argument that third-party standing applies only when providers challenge "law[s] regulating the right to seek or obtain an abortion" as opposed to "government-regulated informed consent"); *Stuart v. Loomis*, 992 F. Supp. 2d 585, 610–11 (M.D.N.C. 2014).

## II.  THE ACT IS NOT AN INFORMED CONSENT STATUTE

The Act is not an informed consent statute because it relates to a procedure Plaintiffs do not provide; provides no information about "the nature of the [medication abortion] procedure, the attendant health risks and those of childbirth, [or] the probable gestational age of the fetus," *EMW Women's Surgical Center, P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019) at 427 (quoting *Casey*, 505 U.S. at 882); and undermines informed consent by giving patients the false and misleading impression that they can begin a medication abortion without having come to a full decision, on the understanding that they can simply reverse the process later. *See* Pls.' Br. 10, 14–16, 18–19. Because the Act "does not facilitate informed consent to a medical procedure," it "is not an

2

informed-consent requirement." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2373 (2018); *see also* Pls.' Br. 13–16.[1]

Tellingly, the State fails entirely to address the fact that the Act undermines informed consent to an abortion. The State's own expert, a Tennessee "reversal" provider, has previously testified that he *opposes* providing information about reversal to patients prior to a medication abortion because it "may end up causing more problems, and you may actually end up increasing the amount of people who take mifepristone [the first of two medication abortion drugs] because they think that they can change [their mind]." Ex. A, Decl. of Christine Clarke Ex. 1, Transcript of September 14, 2018 Deposition of Michael Podraza, M.D. ("Podraza Dep.") at 39:1–40:1, 251:7–21. Yet this is precisely what the Act requires.

The Act's compelled statements relate to a procedure ("reversal" treatment) that Plaintiffs do not provide. In response to this argument, Defendants claim that the Supreme Court struck down the compelled speech statute at issue in *NIFLA* because it applied "regardless of whether a medical procedure is ever sought, offered, or performed." Defs.' Br. 15 (*quoting NIFLA*, 138 S. Ct. at 2373). Defendants conveniently omit the next sentence of the Supreme Court's opinion: "If a covered facility does provide medical procedures, the notice provides no information about the risks or benefits of *those procedures*." *NIFLA*, 138 S. Ct. at 2373 (emphasis added). Here, Plaintiffs provide medical procedures, but the Act's compelled speech provides "no information about the risks or benefits of those procedures." *Id.*

---

[1] Defendants argue that informed consent statutes may require physicians to provide more information than generally required by medical custom or major medical associations. *See* Defs.' Br. 16–17 (quoting *EMW,* 920 F.3d at 428, 438–39). However, the Act does not simply require extra information; it requires statements that actively undermine, rather than facilitate, informed consent. *See* Schreiber Decl. ¶¶ 72–81; Joffe Decl. ¶¶ 26–28, 32–38, 43.

3

The Act also requires "reversal" statements be shown to patients not seeking medication abortion, or indeed any abortion care at all. *See* Tenn. Code Ann. § 39-15-218(d) (requiring signs be displayed in any waiting or consultation room used by patients obtaining abortions); Pls.' Br. Ex. 4, Decl. of Ashley Coffield ¶ 23, ECF No. 6-4 (noting that patients not seeking abortions also use waiting rooms used by abortion patients). If one of Plaintiffs' health centers provided *only* procedural abortions, that health center would nevertheless be required to display the mandated language in large, bold font. *See* Tenn. Code Ann. § 39-15-218(b)–(d).

For these reasons, the Act cannot be considered an informed consent statute. Its compelled speech requirements are thus subject to strict scrutiny,[2] *see NIFLA*, 138 S. Ct. at 2371, 2374, which the Act cannot withstand, *see* Pls.' Br. 16. Any state interest in informing women generally about the availability of "reversal" services could be achieved "without burdening a speaker with unwanted speech," without undermining the informed consent communications between patient and provider, and without threatening physicians with criminal felony prosecution—"most obviously through a public-information campaign." *NIFLA,* 138 S. Ct. at 2367 (internal quotations omitted). The State has offered no evidence that this less intrusive alternative would fail to achieve its interests. That failure is dispositive under strict scrutiny. *Id.* at 2377; *see also San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 16 (1973) ("[S]trict scrutiny means that . . . the State rather

---

[2] Even if the Act's requirements constituted only an incidental limitation on speech, which it is not, the Act would still be subject to intermediate scrutiny, not rational basis review. *See, e.g., 729, Inc. v. Kenton Cnty. Fiscal Court*, 515 F.3d 485, 491 (6th Cir. 2008) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)); *Tagami v. City of Chi.*, 875 F.3d 375, 378–79 (7th Cir. 2017) (explaining that "incidental limitations on First Amendment freedoms" are reviewed under intermediate scrutiny (quoting *O'Brien*, 391 U.S. at 376). At any rate, as discussed in Section IV, the Act cannot survive even rational basis review.

than the complainants must carry a heavy burden of justification . . ." (internal quotation marks omitted)); *Cole v. City of Memphis*, 97 F. Supp. 3d 947, 961 (W.D. Tenn. 2015) (same).

**III.     THE ACT'S STATEMENTS ARE UNTRUE, MISLEADING, AND IRRELEVANT**

In attempting to defend the Act's compelled disclosures as truthful and non-misleading, Defendants rewrite the Act's speech mandate, arguing that the phrase "[i]t may be possible to reverse the intended effects of a chemical abortion utilizing mifepristone" (Tenn. Code Ann. § 39-15-218(b), (f)) merely means that "taking mifepristone alone is not always effective at ending a pregnancy" and does not mean that "mifepristone is reversed by progesterone." Defs.' Br. 17–19.

But this is plainly *not* all the Act requires—and if it were, the Act would be unnecessary, as such information is available on Planned Parenthood's website. *See* Defs.' Br. Ex. C, Decl. of Matthew Dunne, Attach. 1, 2, ECF No. 16-3. Rather, the Act mandates repeated use of the term "reverse." *See* Tenn. Code Ann. § 39-15-218(b), (e)(1), (e)(2), (f).

Defendants have submitted almost 300 pages of material from five expert witnesses arguing in support of the law precisely *because* they understand it to require patients be told about the use of progesterone to supposedly reverse the effects of mifepristone. *See* Defs.' Br. Ex. H, Decl. of Michael Podraza, M.D. ("Podraza Decl.") ¶ 6, ECF No. 16-8 ("I support Tennessee's requirement that all patients who are given mifepristone also be given . . . information on progesterone to increase their chance of a successful pregnancy."); Defs.' Br. Ex. A, Decl. of Dr. Brent Boles ("Boles Decl.") ¶ 13, ECF No. 16-1 (similar); Defs.' Br. Ex. B, Decl. of Dr. Donna Harrison ("Harrison Decl.") ¶¶ 5, 48, ECF No. 16-2 (similar); Delgado Decl. ¶ 44 (similar); Defs.' Br. Ex. J, Decl. of Dr. Martha Shuping ("Shuping Decl.") ¶ 120, ECF No. 16-9 (similar). To the extent that Defendants and their witnesses cannot agree on the meaning of the mandated language, one can only imagine how confusing such language would be for a patient seeking to make

5

important decisions about her health care. *See* Ex. B, Supplemental Decl. of Audrey Lance ("Lance Suppl. Decl.") ¶ 6–7.

The Tennessee legislature was more than capable of writing "the intended termination of pregnancy may not occur after taking mifepristone alone" if that were what it intended. After Arizona's nearly identical compelled speech law was challenged on similar grounds, that state's legislature revised the statute to remove references to "reversal" and require that, if a patient changes her mind after taking mifepristone, the health center inform her that "the use of mifepristone alone to end a pregnancy is not always effective and that she should immediately consult a physician if she would like more information." Ariz. Rev. Stat. § 36-2153(B). The Tennessee legislature could be similarly clear, were that its intent, but it is not.

Defendants struggle to defend the truthfulness of the Act's mandated statements without rewriting them, and do not even attempt to address the Act's misleading nature. While Defendants focus only on the first sentence of the Act's required signage and discharge papers, they omit the first phrase in that sentence, which states that "*[r]ecent developing research* has indicated that mifepristone alone is not always effective at ending a pregnancy." Tenn. Code Ann. § 39-15-218(b), (f) (emphasis added). This alone will mislead patients into believing that new research shows medication abortion is less effective than previously thought, a proposition for which there is no evidence. *See* Schreiber Decl. ¶ 74. Indeed, the State's own witness implies that newer research indicates mifepristone is *more* effective than previously thought. Defs.' Br. Ex. D, Decl. of Dr. George Delgado ("Delgado Decl.") ¶ 35, ECF No. 16-4 (criticizing "older" studies about mifepristone efficacy).

Defendants do not claim that the safety or efficacy of "reversal" treatments have been established, but rather reference one study as supposedly "support[ing] the efficacy" of the

6

treatment while criticizing others for "fail[ing] to demonstrate scientifically that progesterone treatment *cannot* work." Defs.' Br. 8–9 (emphasis added). These arguments get the burdens backwards: physicians do not, as Dr. Delgado suggests, provide drug treatments to people until such treatments are proven to be *un*safe, nor do they presume a theoretical medical treatment works unless it is proven to be impossible. Delgado Decl. ¶ 37; Ex. C, Supplemental Decl. of Courtney A. Schreiber M.D., M.P.H. ("Schreiber Suppl. Decl.") ¶ 4–6. Dr. Schreiber explains, for example, that it would be misleading for physicians to inform patients that hypnotherapy *may* cure cancer, *id.* ¶ 6, even though there may not be any research definitively disproving such a theory.

Similarly, in contending that states may force physicians to say that *anything* "may" be possible unless it has been proven "that it is entirely *im*possible," Defs.' Br. 18–19 (emphasis in original), Defendants turn on its head *Casey*'s holding that physicians may be compelled to give only "truthful and nonmisleading" information. The Supreme Court in *Casey* did not come close to sanctioning state-mandated speech concerning abstract theoretical possibilities; rather, it held simply that physicians could be required to provide undisputedly true statements concerning "the nature of the procedure, the health risks of the abortion and of childbirth, and the probable gestational age" of the pregnancy. 505 U.S. at 881 (internal quotation marks omitted).

As discussed in detail in Dr. Schreiber's rebuttal declaration, the evidence relied upon by Defendants simply does not support the efficacy of "reversal" treatments. *See* Schreiber Suppl. Decl. ¶¶ 9–32. The only published papers claiming to support the use of so-called "reversal" treatments in humans consist of two extremely small case series (concerning a total of nine people) and one larger one, conducted in 2018.[3] *See* Schreiber Decl. Ex. B, C; Harrison Decl. Attach. 3.

---

[3] Defendants' other purported evidence includes a study of rats that did not concern whether progesterone can "reverse" mifepristone, *see* Schreiber Suppl. Decl. ¶¶ 11–13, and a misplaced analogy concerning a different drug that actually undermines their position, *compare* Harrison

7

None of these constitute studies from which information can be gleaned about the efficacy of so-called "reversal" treatments because none used a control group, without which "there is no way to know whether these pregnancies simply did not abort from mifepristone alone (which we would expect since the regimen is a two drug regimen and only one was used) or the progesterone affected the lack of abortion efficacy." Schreiber Suppl. Decl. ¶ 19. As a result "[t]hey do not provide any basis for physicians to change their practice and begin recommending or endorsing the administration of progesterone after mifepristone to 'reverse' the abortion process." *Id.* ¶ 26. Defendants' expert Dr. Podraza admitted that the 2018 study's omission from the study pool of all patients whose pregnancies had already been terminated by mifepristone alone "obviously" skewed the study's results. Podraza Dep. at 201:7–22 ("[I]t seems like the data would be skewed in the direction of favorable outcomes if you intentionally limited all people who had already miscarried from our pool. I mean, it obviously would."). Yet, even with this limitation, the 2018 case series failed to show a statistically significant difference in the rate of continuing pregnancy with or without "reversal" treatment after the ingestion of mifepristone alone. *See* Pls.' Br. 8–9.

Defendants argue that the legislature has latitude to adopt policies where medical professionals disagree. Defs.' Br. 16. But this is not an area of legitimate disagreement among medical professionals—the American College of Obstetricians and Gynecologists, representing 60,000 medical professionals,[4] has reviewed and rejected claims that mifepristone can be "reversed," and the American Medical Association was so disturbed by a statute similar to the Act that it sued to enjoin it. *See generally* Complaint, *Am. Med. Ass'n v. Stenehjem*, No. 1:19-cv-125

---

Decl. ¶ 15 (suggesting that leucovorin can "outcompete" methotrexate), *with* Schreiber Suppl. Decl. ¶ 10 (explaining that leucovorin does not reverse or counteract the pregnancy-terminating effects of methotrexate).

[4] *About Us*, ACOG, https://www.acog.org/about (last visited Sept. 23, 2020).

(D.N.D. June 25, 2019), ECF No. 1. Moreover, as the Sixth Circuit has recognized, the Supreme Court "addressed this very argument" concerning medical uncertainty and rejected it, *EMW*, 960 F.3d at 796, explaining that courts "*retain[] an independent constitutional duty to review the factual findings where constitutional rights are at stake*," *Whole Woman's Health v. Hellerstedt* ("*WWH*"), 136 S. Ct. 2292, 2310 (2016) (emphasis in original) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007)).

None of the State's witnesses has provided any additional evidence that mifepristone can be "reversed." Moreover, none is an expert on medication abortion, nor on informed consent. Dr. Delgado is not an OB-GYN, but rather is a family medicine and palliative care doctor. *See* Delgado Decl. Attach. 1, at 1–2. Dr. Shuping is a psychiatrist who "defer[s] to those specializing in Obstetrics and Gynecology in regard to the safety and efficacy" of medication abortion and "reversal" treatments. *See* Shuping Decl. ¶ 102. While Drs. Podraza and Boles are OB-GYNs, neither has published any papers concerning medication abortion or informed consent. *See* Podraza Decl. Attach. 1; Boles Decl. Attach. 1. Dr. Harrison is the Executive Director of the American Association of Pro-Life OB-GYNs and her prior testimony concerning the supposed dangers of mifepristone has been repeatedly rejected by courts.[5]

---

[5] *See MKB Mgmt. Corp. v. Burdick*, 855 N.W.2d 31 (N.D. 2014) ("Dr. Harrison's opinions have shifted dramatically over time, and appear to be shaped primarily by the position she is advocating at the moment."); *id*. ("Dr. Harrison's opinions lack scientific support, tend to be based on unsubstantiated concerns, and are generally at odds with solid medical evidence. To the extent she referenced published studies during her testimony, Dr. Harrison tended to present the results in an exaggerated or distorted manner."); *Planned Parenthood Ark. & E. Okla. v. Jegley*, 4:15-cv-00784, 2018 WL 3029104, at *42 (E.D. Ark. 2018) ("Dr. Harrison's statements regarding the incidence of complications from medication abortions must be rejected.").

9

Finally, Defendants provide no explanation of how the Act's requirements are relevant to the procedural abortion and non-abortion patients who will be forced to view the Act's mandated disclosures. *See supra* Part II. Moreover, Defendants' argument that the required statements are relevant to medication abortion patients *after* they have taken mifepristone (*see* Defs.' Br. 21) does not explain why the Act mandates the disclosure be given days *beforehand*, when the decision patients are making is whether to start the medication abortion at all.

## IV. THE ACT VIOLATES EQUAL PROTECTION

Although the Act is subject to heightened review, *see* Pls.' Br. 22 n.14, its requirements are so irrational and unrelated to a legitimate governmental interest that it cannot even withstand rational basis review. Defendants note that the state has an interest in "providing patients with information about the consequences and options should they choose not to continue their medication abortion." Defs.' Br. 23. Likewise, Dr. Boles testified that "abortion providers [should] be required to answer the question truthfully when a patient . . . says, 'I'm sorry that I took this. I want to change my mind.'" Boles Decl. Attach. 2, at 24:17–22. But, as previously noted, this is not what the Act requires. Defendants have offered no explanation as to what state interest is furthered by requiring Plaintiffs to provide a confusing statement about "reversal" to patients who have not asked and are at least forty-eight hours away from even beginning their medication abortion—at a time when the state's expert Dr. Podraza agrees providing such statements is harmful to patients. *See supra* 4. Nor have Defendants provided any rationale for requiring the information be shown to patients not obtaining medication abortions or abortions at all.

As Plaintiffs previously explained, *see* Pls.' Br. 10, 15–16, Tennessee does not require physicians to disclose similar information to patients prior to sterilization procedures, even though such procedures actually *are* reversible in some cases, unlike medication abortions. There is no

10

rational basis for treating medication abortion differently. Defendants argue that the Act furthers the state's interests in maternal health and fetal life, *see* Defs.' Br. 23, but the Act's requirements are not rationally related to either. Patients who are not certain about their decision should not start a medication abortion by taking mifepristone because doing so will likely terminate their pregnancy. Schreiber Decl. ¶¶ 79–80. Encouraging these patients to proceed without having come to a full decision on the misunderstanding that the process is reversible does not advance an interest in fetal life or maternal health—an issue Defendants wholly fail to address. As a result, the relationship between the Act and the "asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

## V. DECLARATIONS SUBMITTED BY DEFENDANTS DO NOT MITIGATE THE ACT'S HARMS

On September 25, 2020, this Court ordered that Defendants could submit declarations "stating they will not prosecute or sanction an abortion provider who states, verbally and/or in writing, disagreement with the disclosures required by the legislation," if Defendants wished such declarations to be considered by the Court. Order at 1, Sept. 15, 2020, ECF No. 19.

In response, Defendants filed seven declarations. As an initial matter, each declaration save one misreads the Act as requiring an "oral" disclosure. *See* Tenn. Code Ann. § 39-15-218(e) (requiring a patient be "informed by the physician" of the mandated statement).[6]

---

[6] Not only does the Act not require oral provision of the mandated statement, a prior version that *did* require the mandated information to be "provided to the woman, via telephone or in person" was amended to "remove[]" the specification that the notice be given "by telephone or in person." *HB 2568,* Tennessee General Assembly ("Summary" Tab), http://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB2568&ga=111 (last visited September 23, 2020). Moreover, during hearings on the Act, HB 2568's sponsor, Rep. Faison, testified that a similar Arizona law had been challenged because it "was compelling the doctor to say stuff" and that the Act was *different* because "what we've done is that it has to be on the walls and made it, uh made it available that they have to see what's going on and we're not compelling speech . . . ." *Hearing on H.B. 2568 Before the H. Pub. Health Subcomm.,* 111th Gen. Assemb.

11

Six of the seven declarations fail to provide the assurance the Court referenced.[7] The President of the Tennessee Board of Medical Examiners declared that, though he does not interpret the Act as making disassociation or disavowal sanctionable, "the Board can also take disciplinary action against a physician for: unprofessional, dishonorable or unethical conduct, making false statements or representations, and being guilty of fraud or deceit in the practice of medicine." Decl. of W. Reeves Johnson, Jr., M.D. ¶ 9, ECF. No 28-2 (internal quotation marks and alterations omitted). The declarations of the Chair of the Board for Licensing Health Care Facilities and Commissioner of the Department of Health include similar caveats. Decl. of Rene Saunders, M.D. ¶ 11, ECF No. 28-3; Decl. of Lisa Piercey, M.D. ¶ 7, ECF No. 28-1.[8]

The District Attorneys for the 6th, 15th, and 30th Judicial Districts submitted declarations that indicate their understanding that the Act imposes no criminal liability for physician disassociation or disavowal, but did not state that they would not prosecute providers who disavow or disassociate from the disclosures. *See* Decl. of Amy P. Weirich ¶¶ 7–8, ECF No. 28-4; Decl. of Charme P. Allen ¶¶ 7–8, ECF No. 28-5, Decl. of Tom P. Thompson ¶¶ 7–8, ECF No. 28-6.

These declarations, save one, do not state that Defendants will not prosecute (and/or impose civil or licensure penalties on) Plaintiffs for disavowal, despite the state's position that providers may express disagreement with the Act's mandated disclosures. *See supra* Part III.

---

(Feb. 25, 2020) (statement and questioning of Rep. Jeremy Faison, Chairman, H. Republican Comm.) (starting at time 00:23:23). Requiring an oral statement would be contrary to both the language and the clear legislative intent of the Act.

[7] Defendant Funk has declared, "I do not believe T.C.A. §§ 39-15-218(b) and 39-15-218(e) are constitutional, therefore I will not enforce those provisions." Decl. of Glen Funk, ECF No. 29-1.

[8] The Commissioner's declaration further did not address penalties against abortion *facilities*, which the Act authorizes the Department to impose, Tenn. Code Ann. § 39-15-218(k). *Id.*

12

## VI. PHYSICIAN DISAVOWAL CANNOT NEGATE THE ACT'S HARMS

Allowing Plaintiffs to contradict and disassociate themselves from the Act's requirements would not cure the Act's harms and is "virtually certain to cause confusion and distract [patients] from the essential information they need to make a decision." Joffe Decl. ¶ 43. This is particularly so with language as confusing as that required by the Act. *See supra* Part II. "When patients are provided contradictory medical information, they are likely to become confused" because "there is only so much information anyone can process at once," especially while they are also trying to make important decisions. Ex. D, Rebuttal Decl. of Steven Joffe, M.D., M.P.H., ¶ 4. Moreover, it is crucial that patients understand that they must be certain in their decision to terminate a pregnancy before taking mifepristone. However, the mere fact that the State requires "reversal" information be given to patients days in advance "indicates strongly to patients that they *should* be taking the supposed reversibility of medication abortion into account in their decision-making—even if their physician clearly states otherwise." *Id.* ¶ 8. Thus, no matter how forcefully Plaintiffs attempt to disavow the Act's mandated message, the Act's requirements still create the risk that patients will be misled into taking mifepristone without having first come to a full decision.

Defendants cite no case law for the proposition that a First Amendment violation may be cured by physician disavowal, *see* Defs.' Br. 28, instead citing only cases concerning disassociation, which themselves acknowledge the issue's irrelevance to the compelled speech analysis, *see EMW*, 920 F.3d at 439 n.19 (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 737 (8th Cir. 2008)). Indeed, if disavowal cured First Amendment harms, the constitutional prohibition on compelled speech would be rendered toothless, as any compelled statement could be disavowed. In *NIFLA*, the Supreme Court struck down a requirement that crisis pregnancy centers post information about the availability of abortion care, despite the fact that

13

those centers existed for the purpose of dissuading people from obtaining an abortion. 138 S. Ct. at 2371, 2378. That those facilities' staff were free to express their opposition to the state message had no bearing on the statute's constitutionality. As the Court noted:

> Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields. Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana. . . . The best test of truth is the power of the thought to get itself accepted in the competition of the market, and the people lose when the government is the one deciding which ideas should prevail.

*Id.* at 2374–75 (internal citations, alterations, and quotation marks omitted).

## VII. CONCLUSION

For the foregoing reasons as well as those set forth in Plaintiffs' opening brief, Plaintiffs respectfully request that this Court temporarily and/or preliminarily enjoin Defendants from enforcing the Act, as the potential harms to Plaintiffs and their patients are great, and the harms to the State of temporarily preserving the status quo are negligible.

Dated: September 25, 2020

Respectfully submitted,

*/s/ Thomas H. Castelli*
Thomas H. Castelli (No. 24849)
Stella Yarbrough (No. 33637)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 12160
Nashville, TN 37212
Tel: (615) 320-7142
tcastelli@aclu-tn.org

*Attorneys for Plaintiffs*

Christine Clarke*
Jennifer Sandman*
Planned Parenthood Federation of America

14

123 William St., 9th Floor
New York, NY 10038
Tel: (212) 261-4749
Tel: (212) 261-4405
Fax: (212) 247-6811
christine.clarke@ppfa.org
jennifer.sandman@ppfa.org

*Attorneys for Plaintiffs Planned Parenthood of Tennessee and North Mississippi and Audrey Lance, M.D., M.S.*

Andrew Beck*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
abeck@aclu.org

*Attorney for Plaintiffs Knoxville Center for Reproductive Health and FemHealth USA, Inc.*

Michelle Moriarty*
Center for Reproductive Rights
199 Water St., 22nd Floor
New York, NY 10038
mmoriarty@reprorights.org

Marc Hearron*
Center for Reproductive Rights
1634 Eye St., N.W., Suite 600
Washington, DC 20006
mhearron@reprorights.org

*Attorneys for Plaintiff Memphis Center for Reproductive Health*

*Admitted *pro hac vice*

15

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Notice has been served on the following counsel of record through the Electronic Filing System on this 25th day of September, 2020:

ALEXANDER S. RIEGER
Assistant Attorney General
Office of the Attorney General
Public Interest Division
P.O. Box 20207
Nashville, TN 37202
(615) 741-2408
Alex.Rieger@ag.tn.gov

CHARLOTTE DAVIS
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
(615) 532-2500
Charlotte.davis@ag.tn.gov

EDWIN ALAN GROVES, JR.
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
(615) 741-2850
Alan.groves@ag.tn.gov

> /s/ Thomas H. Castelli
> Thomas H. Castelli (No. 24849)
> American Civil Liberties Union
> Foundation of Tennessee
> P.O. Box 12160
> Nashville, TN 37212
> Tel: (615) 320-7142
> tcastelli@aclu-tn.org
>
> *Attorney for Plaintiffs*